Bruce L. Thall, Esquire
Heather M. Eichenbaum, Esquire
David B. Picker, Esquire [DP-9658]
SPECTOR GADON & ROSEN, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8888 / FAX- (215) 241-8844
*Lead Counsel for Plaintiffs*

Edward Finkelstein, Esquire [EF-2805]
TARTER, KRINSKY & DROGIN P.C.
1350 Broadway
New York, New York 10018
Tel: 212-216-8000 / FAX- 212-216-8001
*Local Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| DREAMLAND AMUSEMENTS, INC., TOY CIRCUS , INC., CROSSROADS TRUCKING CORP., ROBERT DESTEFANO, and KATHRYN DESTEFANO, | : : : : : | |
| Plaintiffs, | : : | Civil Action No. 08-cv-6321 (JGK) |
| v. | : : | |
| THE HONORABLE ANDREW M. CUOMO, ATTORNEY GENERAL, OFFICE OF THE ATTORNEY GENERAL, STATE OF NEW YORK, | : : : : : | |
| Defendant. | : : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION**
**FOR PRELIMINARY AND/OR PERMANENT INJUNCTION**

**I.    FACTS AND PROCEDURAL HISTORY**

**A.    Plaintiffs' Complaint for Declaratory Judgment**

The Attorney General of the State of New York has undertaken an investigation

and now represents that he has found violations of state law warranting both wider investigation

and civil prosecution of Plaintiffs. The violations at issue are asserted by the State Attorney

General to be state law claims for relief rising solely from the alleged breaches by Plaintiff

Dreamland of one pre-typed sentence contained in Dreamland's two page Alien Employment

Certification that it signs and files with the United States Departments of Labor and Homeland

Security. The State Attorney General contends, albeit incorrectly, that resulting from

Dreamland's failures to pay its temporary, seasonal non-agricultural foreign citizen workers the

wages due under the Certification, deemed by the State Attorney General to be a binding

contract, the failures are deemed "persistent illegality" and "fraud" by the State Attorney

General, violative of state statutes within his investigative and prosecutorial jurisdiction.

    Dreamland denies that any such breach has occurred and is prepared to meet head

on any assertion to the contrary brought by any person, department or agency with jurisdiction to

investigate the alleged breach of the certifications/contracts with the United States and with

standing to pursue and prosecute such allegations.

    The New York State Attorney General is not such a person. As is set forth

hereinafter, preemption necessarily bars anyone, including the New York State Attorney

General, from proceeding with an investigation and prosecution of state statutory or state

common law claims of any and every ilk, including fraud, arising from the alleged breach by

Dreamland of its Certification/contract with the United States Departments of Labor and

Homeland Security.

    Moreover, the New York State Attorney General has no right or power to conduct

an investigation or initiate a prosecution as straw man for the United States Departments of

Labor, Homeland Security and Justice, nor has he even been asked to do so. To the contrary, the

thorough, extensive federal statutory and regulatory scheme governs every nook and cranny of

2

Dreamland's Certification/contract with the federal government, and provides administrative, civil and criminal sanctions for breaches of such certifications and frauds committed in connection therewith.

Thus, the New York State Attorney General lacks the right, power, or duty to investigate or act. Assuming, *arguendo*, that the law were to the contrary, which it is not, nonetheless the precise question that is the subject of the State Attorney General's investigation - - the determination of the federal prevailing wage that a seasonal, temporary alien worker with a special work visa is entitled to receive from his employment in an industry specifically exempted from the wages, hours and overtime strictures of the Fair Labor Standards Act -- is itself a federal question clearly committed solely to the jurisdiction of the United States Department of Labor for an answer, were there any question raised. Once again, the matter at issue is exclusively committed to the federal authorities for resolution.

Plaintiffs have so advised the New York State Attorney General both orally and in writing, and have suggested that the state officer submit the matter to the United States Department of Labor. [Complaint for Declaratory Judgment, Exhibit B, letter of July 8, 2008 from undersigned counsel to the New York State Attorney General]. Even though the federal authorities who have approved and policed Dreamland's certifications/contracts with the USDOL and USDHS have not seen fit to open an investigation into Dreamland's performance under its federal certifications/contracts, perhaps the violations already found by the New York State Attorney General and the fruits of his investigation will convert the USDOL and USDHS to the New York State Attorney General's point of view.

3

The New York State Attorney General, however, has declined to accept that suggestion and instead has expanded the temperal scope of his investigation by a factor of two, while preparing the filing of his prosecution of Plaintiffs.

Thus, Plaintiffs were compelled to file their Complaint for Declaratory and Injunctive Relief. The instant pleading is Plaintiffs' formal Motion for a Preliminary and/or Permanent Injunction, to enforce Plaintiffs' rights against the wholesale trampling of them by the size 32 EEE shoe of the State Attorney General.

Because of visceral reactions against the relief Plaintiffs' here seek, and because the laws at issue are somewhat obscure and principles of decision arcane, Plaintiffs are setting out the facts and applicable law in painful detail in order to manifest beyond per adventure that their position is correct in all essential regards, and that their entitlement to injunctive relief is compellingly clear. Indeed, the detail contained in this analysis is intended to constitute a manifesto that brooks no meaningful response by the State Attorney General.

To that analysis Plaintiffs now turn.

**B.    The Pervasive Federal Program Governing the Employment of Alien Temporary Nonagricultural Workers by Dreamland**

**1.    The Application**

The regulations of the Department of Homeland Security's United States Citizenship and Immigration Service ("USCIS"), codified at 8 CFR 214.2(h)(6) apply to employers who wish to import alien temporary nonagricultural workers classified under 8 U.S.C. § 101(a)(15)(H)(ii)(b) of the Immigration and Nationality Act of 1952, as amended, to work in temporary jobs in the United States. 8 U.S.C. § 1184(c)(1) of the Immigration and Nationality Act requires that the United States Department of Homeland Security ("DHS") consult with the United States Department of Labor

4

before determining whether any worker can be admitted under 8 U.S.C. § 101(a)(15)(H)(ii)(b).[1]

Moreover, 8 U.S.C. § 1184 (g)(1) of the Immigration and Nationality Act limits the number of aliens during any fiscal year who can be issued visas or provided nonimmigrant status, now set at 66,000.

The USCIS regulations, codified at 20 CFR 655(a) and 8 CFR Part 214.2(h)(6), require that employers who file petitions for H-2B workers with the USCIS must include a certification from the United States Department of Labor ("USDOL") stating that qualified workers are not available in the United States and that the employment of foreign workers on United States soil will not adversely affect wages and working conditions of similarly employed United States workers. If the USDOL does not so certify, the employer may submit countervailing evidence to DHS's USCIS.

In order to obtain the requisite certification from the USDOL, an employer must file an Application for Certification of Temporary Nonagricultural jobs on a USDOL Form ETA-750, Part A of which constitutes the Employer's Application for Alien Employment Certification. That two page form contains the representations by the employer, based upon a single pre-printed sentence on the Form ETA-750 which, in the case at bar, constitute the sole basis upon which the New York State Attorney General has concluded, albeit incorrectly, that Dreamland has persistently and repeatedly engaged in fraudulent conduct by not paying wages as the State Attorney General computes.

Federal law requires that the ETA-750 be submitted to the United States Department of Homeland Security for its review and input. That form is submitted to the appropriate State Workforce Agency ("SWA") for a determination of the prevailing wages in the geographic areas in which the alien will work. The USDOL recommends that the employer seeking H-2B workers should submit the ETA Form 750 certification/contract at least sixty days, but no more than one hundred twenty days, before the need for the workers is expected to arise.

---

[1]     Hence, "H-2B employees."

In order to ensure that the employment of the H-2B workers does not usurp jobs from the United States workers, the duration of the employment requested must be for less than one year with the need for the labor being seasonal or intermittent, as is set forth in General Administrative Letter No. I-95 (November 10, 1994), amended by the General Administrative Letter No. I-97 Change I (December 22, 1997).

On receiving the Form ETA-750, the SWA prepares a job order and places it into the Employment Service System for ten days. The employer then advertises the job opportunity in newspapers of general circulation for three consecutive days, or in union, professional trade or other publications, whichever is most appropriate for the occupation and likely to result in responses from United States based workers. The employer must also document that unions and other recruitment sources appropriate for the occupation and customary for the industry could not refer qualified U.S. workers.

On completion of the advertisements and upon the inability to obtain referrals from unions and other recruitment sources, the employer then submits a recruitment report to the SWA setting forth its efforts to obtain United States workers and, if applicable, lawful reasons for not hiring any United States workers who may have applied.

When filing an application for H-2B workers, it is not necessary for the employer to name each temporary foreign worker it wishes to employ. An employer, as did Dreamland, may submit a request for multiple unnamed alien workers so long as each worker will be performing the same types of work under the same terms and conditions and the same occupation within the same areas of intended employment over the same period of time.

The SWA then sends the complete application to the appropriate Federal National Processing Center ("NPC") within the United States Department of Labor. The NPC Certifying

6

Officer determines whether there are other appropriate sources of workers from which the employer should have recruited in order to obtain qualified United States workers. The NPC Certifying Officer grants the temporary labor certification for H-2B workers so long as the NPC concludes that the employment of the aliens will not adversely affect the wages and working conditions of similarly employed United States workers. That finding is fundamental in view of the Immigration and Naturalization Act itself and particularly 8 U.S.C. § 1101(a)(H)(i)(b), authorizing Congress to enact laws allowing the employment of aliens "to perform temporary service or labor if unemployed persons capable of performing such services or labor cannot be found in this country".

The USDOL's NPC Certifying Officer's temporary labor certification is used by the employer to support its petition for visas for foreign wokers filed with USCIS. The USDOL's labor certification determination, together with USCIS Form I-129 "Petition for Nonimmigrant Worker" is submitted to the United States Department of Homeland Security's United States Citizenship and Immigration Services, together with appropriate filing fees.[2]

The states have no role whatsoever in connection with this process. In this regard, the sole function performed by any state entity is the communication to the United States Department of Labor or the USCIS of the prevailing hourly wage rates in locations within the states and placement of Plaintiff's job orders before forwarding the application to USDOL's National Processing Center

### 2.    Exempt and Non-Exempt Businesses.

United States workers and nonimmigrant H-2B workers are each accorded protections applying to United States workers under the Fair Labor Standards Act ("FLSA").

---

[2]      These fees are used to fund the administrative fraud prevention and abuse regulatory scheme regarding employers' applications for temporary H-2B workers.

7

The Federal FLSA, 29 U.S.C. § 201 et seq., sets forth minimum wage, hour and overtime strictures generally governing the relationship between employers and employees. 29 U.S.C. §§ 206, 207.

Certain industries and businesses have been exempted from the wages, hours and overtime provisions of the FLSA, including Dreamland. 29 U.S.C. § 213(a) of the FLSA, headed "Minimum Wage and Maximum Hour Requirements," exempts seasonal amusement and/or recreational establishments from the minimum wage and maximum hour strictures of the FLSA, if the carnival operates for less than seven months a year, or its average receipts for any six months are not more than 1/3 of its average receipts for the other six months. As a seasonal, nomadic carnival, Dreamland falls within the amusement exception. The amusement exemption is mirrored in the Code of Federal Regulations 29 CFR 779.385; moreover, the amusement enterprise exemption is also a fixture of the New York Labor Laws. See, e.g., 12 NYCRR §§ 142-2.2, 142-3.2.

Part A of the USDOL Form ETA-750, the two page document on which the New York Attorney General bases his prosecution, is devoid of any inquiry into the exempt or nonexempt status of the employer under the FLSA and has no place at which the exempt status of the employer may logically be inserted or added. Moreover, the State Attorney General has admitted that he is investigating and prosecuting Plaintiffs as if they were not an exempt amusement enterprise.

### 3.    Federal Fraud Prevention and Prosecution.

Effective October 1, 2005, through the Save Our Small and Seasonal Businesses Act, amending yet again the Immigration and Naturalization Act and codified at 8 U.S.C. § 1184 (c)(1) and (c)(12-14) and 8 U.S.C. § 1356 (v), with scores of pages of supporting regulations, the

8

United States Congress broadened and supplemented the INA's fraud prevention and detection system to prevent, detect and address instances of employer fraud with respect to Form ETA-750 petitions. The statutory scheme requires consultation among and between the Secretaries of State, Homeland Security, and Labor in order to prevent and detect fraud with respect to petitions filed by employers seeking nonagricultural, temporary workers. The penalties for violators include administrative fines of up to $10,000.00 for each violation, as determined to be appropriate by the Department of Homeland Security. The statutory scheme also authorizes the Department of Homeland Security to automatically deny any ETA-750 petitions filed by employers for a period of up to five years. The Act also permits the Secretary of the United States Department of Homeland Security to delegate the authority to impose those sanctions to the United States Secretary of Labor. He has not yet done so.

This statutory scheme, aimed at rooting out, ending and punishing employers who submit false and fraudulent Forms ETA-750 to the USDOL or who do not comport with their representations made to the United States Department of Labor and United States Department of Homeland Security on the Federal Forms ETA-750, is independent of the power and duty of the United States Department of Justice to prosecute as felons those who make false statements to the USDOL in connection with applications for temporary, nonagricultural H-2B workers or false statements under 18 U.S.C. § 1001; mail fraud under 18 U.S.C. § 1341; wire fraud under 18 U.S.C. § 1343; or RICO pursuant to 18 U.S.C. § 1961.

Thus, the exhaustive and inclusive H-2B federal employer fraud detection and prevention regime is comprehensive, including administrative, civil, and criminal penalties for any employers who run afoul of the Federal Form ETA-750 petition seeking H-2B workers with the United States Department of Labor and United States Department of Homeland Security,

9

charged with meting out appropriate sanctions for administrative and civil proceedings, with violations amounting to serious fraud investigated and prosecuted by the United States Department of Justice.

### C.    The Business of Dreamland, its Contract with the USDOL and its Limited Operations in New York and its Amusement Enterprise Exemption

Dreamland, Toy Circus and Crossroads are a peripatetic, mobile carnival, generally partnering with charitable, non-profit organizations as part of their fund-raising efforts. For much of the year, Dreamland operates its carnival with its charitable organization partners in small and mid-sized towns in states up and down the East Coast of the United States.

For 2008, Dreamland scheduled its carnival in venues such as New London, Connecticut; West Chester, Pennsylvania; Westport, Connecticut; Leonia, New Jersey; Mt. Pocono, Pennsylvania; Budd Lake, New Jersey; New Haven, Connecticut; Bennington, Vermont; Lyndonville, Vermont; Lancaster, New Hampshire; Ledyard, Connecticut; Fort Bragg, North Carolina; Augusta, Georgia; and other small and mid-sized cities and towns along the East Coast of the United States. Dreamland is scheduled to operate its mobile carnival at New York State venues, such as Islip, Levittown, Farmingdale and New Paltz for approximately six weeks during the year 2008, with some stops as short as three days.

Nonetheless, the New York State Attorney General purports to prosecute Plaintiffs for their activities throughout the length and breadth of their tour stops, even though few occur within New York State.

The Fair Labor Standards Act ("FLSA") sets minimum wage, hour, and overtime requirements for employers. 29 U.S.C. §§ 201, 206, 207. Some employers, however, are exempt. 29 U.S.C. § 213(a), headed "Minimum Wage and Maximum Hour Requirements,"

10

exempts amusement and/or recreational establishments from the minimum wage and maximum

hour and, therefore, overtime requirements. The statute reads, in relevant part:

> The provisions of § 206… and § 207 of this Title shall not apply with respect to ---
> (3) any employee employed by an establishment which is an amusement or
> recreational establishment…if (A) it does not operate for more than seven months in
> any calendar year, or (B) during the preceding calendar year, its average receipts for
> any six months of such year were not more than 33⅓ per centum of its average
> receipts for the other six months of such year…

For certain years Dreamland had not operated its core business for more than

seven months in any calendar year. For each year, however, its average receipts for any six

months of such year are not more than ⅓ of its average receipts for the other six months.[3]

Thus, Dreamland is exempt from the minimum wage and maximum hour

requirements of the Fair Labor Standards Act, and its employees, including its approximately 20

H-2B employees for 2008, are not covered by the FLSA minimum wage, hour, and overtime

requirements.[4] The New York Labor Laws contain the amusement enterprise exemption as well.

See, e.g., 12 NYCRR §§ 142-3.2, 142-2.2

Likely due to the fact that Dreamland is an exempt amusement enterprise so that

wages, hours and overtime do not apply to employees of Dreamland, and because high costs of

its labor intensive operation and limited ability to generate revenue effectively preclude mobile

carnivals such as Dreamland from deriving sufficient revenues to pay a full complement of

United States born workers a wage sufficient to induce employment with Dreamland, Dreamland

is compelled to look beyond the borders of the United States in order to find workers who are

willing to be itinerant mobile carnival employees in return for wages that mobile carnivals such

---

[3]    Dreamland does not generally schedule its carnival in late fall and early winter and therefore has no
receipts for several months in each calendar year. Its average receipts for any six months in a calendar year range
from approximately 18% in 2005 to 26% in 2006.
[4]    Not surprisingly, the FLSA amusement establishment exemption is mirrored in the Code of Federal
regulations. 29 C.F.R. 779.385.

as Dreamland can afford to pay them and remain in business. Dreamland currently employs

approximately one score such foreign national workers, each of whom has an "H-2B" visa issued

by the Federal Government under the Immigration and Naturalization Act based upon

Dreamland's application to the United States Department of Labor and the United States

Department of Homeland Security, which the United States Departments have approved.

        In order to obtain the temporary, seasonal employees from foreign countries,

Dreamland followed each and every step set forth in § I(B), *supra*, first advertising for native-

born workers and then certifying to the United States Department of Labor and United States

Department of Homeland Security that its temporary need for the alien employees is based upon

its inability to obtain native-born workers. The form that Dreamland must submit to the

Department of Homeland Security's USCIS[5] in connection with its request for permission to

employ alien seasonal workers requires the submission of precisely such an explanatory

justification. The form submitted by Dreamland for the year 2008 recites at Section 2(3) under

"Explain your temporary need for the alien's services" the following:

DUE TO THE SHORTAGE OF U.S. WORKERS TO FILL THE LABORER POSITIONS
WITH OUR ANNUAL TOURS, WE HAVE A CRITICAL NEED FOR TEMPORARY
WORKERS TO ERECT LOADING AND UNLOADING BEFORE/AFTER EACH TOUR
STOP. WE HAVE ADVERTISED AND RECRUITED ONCE AGAIN PER THE
GUIDELINES AND INSTRUCTIONS AS SET FORTH BY THE DOL/INS FOR THIS
JOB CATEGORY.

WE HAVE ALSO POSTED HELP-WANTED SIGNS AT THE VARIOUS CITIES THAT
WE TRAVEL TO DURING OUR TOURS.

BECAUSE THIS JOB INVOLVES OUTDOOR WORK, MANY PEOPLE BECOME
DISCOURAGED BY HAVING TO WORK IN THE ELEMENTS (HEAT, COLD, RAIN,
ETC.). HOWEVER, THE MAIN PROBLEM IS FINDING PEOPLE THAT ARE
WILLING/ABLE TO TRAVEL ON TOUR TO THE VARIOUS LOCATIONS FOR THE
ENTIRE DURATION OF OUR OPERATING SEASON. THESE REASONS MENTIONED
ALSO MAKE THIS TEMPORARY NEED NECESSARY FOR US TO BE ABLE TO
CONTINUE TO OPERATE SUCCESSFULLY AND TO MEET OUR COMMITMENTS
AND NOT LOSE OUR DATES TO THE COMPETITION.

---

[5]    The form is the H Classification Supplement to Form I-129.

12

This certification by Dreamland to the United States Department of Homeland Security and its United States Citizenship and Immigration Service is crucial in order to comport with the Immigration and Naturalization Act. Central to the Act is ensuring that United States workers are not displaced from obtaining employment by alien, seasonal workers. See, e.g., 8 U.S.C. § 1101(a)(H)(ii)(b) (setting out the power of the United States Congress to enact laws governing aliens residing in a foreign country which they have no intention of abandoning, who come to the United States "to perform temporary service or labor <u>if unemployed persons capable of performing such services or labor cannot be found in this country</u>.") (Emphasis supplied). The seasonal, temporary alien employees sought by Dreamland have H-2B visas based upon this subsection of 8 U.S.C. § 1101(a).[6]

As is set forth in § I(B), *supra*, the process of obtaining H-2B workers for enterprises such as Dreamland is one governed solely and exclusively by federal law, with virtually each and every step in the process committed exclusively to the United States Department of Labor, the United States Department of Homeland Security and its United States Citizenship and Immigration Services, and the United States Departments of State and Justice.

The document upon which the New York State Attorney General bases his pursuit and prosecution of Plaintiffs is a preprinted sentence of the two-page component of the massive documentation submitted by and for Dreamland to the United States Department of Labor, the United States Department of Homeland Security and their designees in multiple federal departments, and their agencies and bureaus within, in order to obtain H-2B visas for seasonal,

---

[6]    Intriguingly, were the State Attorney General correct in his view that Dreamland was required to pay each H-2B worker prevailing wages and at forty hours per week, and at time and one/half for overtime, the H-2B workers would be paid more than native born United States workers for the same position. This, of course, directly contradicts and undercuts the FLSA exemption and obliterates both the statute and premise upon which the H-2B workers are hired in the first instance.

13

foreign born employees. Those here at issue, and upon which the State Attorney General purports to base its prosecution, however misguided, are the United States Department of Labor, Employment and Training Administration Forms ETA-750A.[7] Those filed by Dreamland in anticipation of the 2006, 2007 and 2008 Dreamland mobile carnival tours are attached hereto as Exhibit "A".[8]

Review of the federal form ETA-750 is instructive. First, as recommended by the USDOL, each was signed and submitted four to six months before the year within which the H-2B employees of unknown numbers and identities will be working. Before the tour stops are finalized, the precise numbers of employees required and such niceties as even the length of the season are not known or knowable as of the time of submission of the form ETA-750 to the United States Department of Labor. Moreover, as is reflected on the first page of each of the forms, all enclosures must also be submitted to the United States Citizenship and Immigration Services of the United States Department of Homeland Security, as well as the United States Department of Labor.

The two-page "Application for Alien Employment Certification" contains at paragraph 23(b) under "Employer certifications" the following pre-printed language:

> The wage offered equals or exceeds the prevailing wage and I guarantee that if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.

---

[7]   Neither Crossroads nor Toy Circus has ever applied for or employed any alien with or without an H-2B visa. This fact, uncontested and uncontestable, has been communicated orally and in writing to the State Attorney General. The fact has not had any impact upon the State Attorney General's subpoenas or investigation.

[8]   The original office subpoena propounded by the State Attorney General on May 23, 2008 covers the period from January 1, 2006 through the present. On July 8, the State Attorney General served by email a supplemental subpoena purporting to cover the period July 8, 2002 through December 31, 2005. The earlier forms are similar or identical in all material reports.

There is not, nor could there be, any specific guarantee contained in the Federal Form ETA-750, with respect to the number of H-2B workers Dreamland will employ, or the number of weeks that each H-2B worker will be employed, or the number of hours each employee will work per week, much less the number of hours of overtime.

What is instructive, however, is the absence of any guarantee of hours of work, much less hours of overtime.  For example, Block 10 on the Federal Form ETA-750 submitted to the United States Department of Labor by Dreamland for 2006, recites an estimate of 40 hours basic and no overtime per week with no rate of payment for overtime.  The form instead lists a basic weekly rate of pay of $310.80 per H -2B employee.  This ETA-750 submission for Dreamland was approved by the United States, as were all others.

Equally instructive is what is excluded from the Federal Form ETA-750.  There is no place on the form for noting that the employer is exempt from the wages and hours and overtime provisions of the FLSA, or otherwise noting that whatever is the "applicable prevailing wage" as preprinted in paragraph 23(b) of the Form ETA-750, it is not the FLSA prevailing wage, hour and overtime strictures and rates.

The New York State Attorney General has represented orally and in writing that the violations its investigation has found of "repeated fraudulent and illegal acts" and/or "persistent fraud and illegality" are premised solely upon its contention that Dreamland repeatedly failed to pay to its H -2B employees the prevailing wage as computed by the State Attorney General, as required by pre-printed paragraph 23(b) of the general certification Dreamland made to the United States Department of Labor and the United States Department of Homeland Security.  That the State Attorney General deems the FLSA irrelevant to its quest is

15

manifested by the fact that its original office subpoena encompasses a timeframe that precludes the Attorney General from determining whether the FLSA exemption applied, save for one year.

One may fairly ask how the State Attorney General can make such a determination across the swath of Dreamland's multi-state carnival route, particularly in view of the FLSA exemption. One may also fairly ask how it is that the State Attorney General has arrogated onto himself the determination that the FLSA exemption should be ignored, and instead deem that the pre-printed language of 23(b) of the two page ETA-750 both vacates the FLSA exemption and reimposes that Act's wage, hour and overtime requirements, and more. Plaintiffs have asked. The State Attorney General has not provided an answer.

The New York State Attorney General has thus created out of whole cloth from his skewed view, that the preprinted paragraph 23(b) on the Federal Form ETA-750 certification constitutes a binding contract to pay FLSA wages, hours and overtime so that Dreamland's alleged breach of its certification/contract with the United States Department of Labor is a "repeated and persistent fraud and fraudulent misrepresentation" that he has the power to prosecute under state laws. Thus, his investigation and prosecution encompass wages paid by Dreamland to its H-2B employees at each and every small and mid-sized town throughout the Eastern United States at which Dreamland sets up its mobile carnival.

This it cannot lawfully do. Indeed, any such investigation, much less a prosecution, is within the sole and exclusive power and jurisdiction of the United States due to Preemption. Moreover, were there a question regarding the interpretation of the wage certification at ¶ 23(b) of the Alien Certification, that question, too, may only be answered by the United States Department of Labor and/or the United States Department of Homeland Security.

16

Finally, were there "fraud," the prosecution is solely the right and duty of the United States, including the United States Department of Justice.

       Thus, Plaintiffs respectfully submit that they are entitled to the declaratory relief they seek and an injunction as the means to enforce it.

## II.    **LEGAL ARGUMENT**

### A.    <u>The Standards Governing the Granting of Injunctive Relief</u>

       Although absent from the body of Fed. R. Civ. P. 65 itself, the authority to issue injunctions, derived from the Court's inherent equitable powers, hinges upon a determination that a party meets some or all of the four-factor test for injunctive relief: (1) irreparable injury; (2) inadequacy of remedies at law; (3) the balance of the hardships favors the party seeking injunctive relief; and (4) consideration of the public interest. See, e.g. <u>eBay, Inc. v.</u> <u>MercExchange, LLC</u>, _____ U.S. _____, 126 S. Ct. 1837 (2006); <u>In re Zyprexa Injunction</u>, 474 F. Supp.2d 385 (E.D.N.Y. 2007). As is set forth at paragraphs 63 through 67 of their Complaint for Declaratory Judgment and Injunctive Relief, Plaintiffs respectfully submit that they have manifested an entitlement to injunctive relief.

       Although there is no one litmus test against which applications for injunctive relief may be scientifically analyzed, Plaintiffs respectfully submit that in instances in which states act to eliminate or limit federally created or derived rights of constitutional, statutory, or even common law dimension, courts routinely grant injunctive relief, recognizing in part that the deprivation of the federal right itself constitutes irreparable harm. It is beyond peradventure that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights. Implicit in the federal system, the law has explicitly recognized such jurisdiction since <u>Ex</u> <u>parte Young</u>, 209 U.S. 123, 160-162 (1908). <u>See</u>, e.g., <u>Camacho v. Texas Workforce Comm'n</u>,

326 F.Supp.2d 794 (S.D.Tex. 2004) (enjoining state proposed rules limiting eligibility for cash

and medical assistance); Western State Univ. of S. California v. American Bar Ass'n, 301

F.Supp.2d 1129 (S.D.Ca. 2004) (mandatory injunction prohibiting withdrawal of law school's

provisional accreditation); Pankos Diner Corp. v. Nassau County Legislature, 321 F.Supp.2d.

520 (E.D.N.Y. 2003)(enjoining enforcement of county law barring smoking in restaurants due to

loss of business and inability to obtain monetary damages against the state due to Eleventh

Amendment); Karahabodas Co. v. Perusahaan Pertambangan Minyakdangas Bumi Nebara, 264

F.Supp.2d 470 (S.D.Tex. 2002)(enjoining actions of Indonesian manager to annul arbitral award

in Indonesian court, because contractor would be forced to relitigate issues which contractor had

won in district court); Ford Motor Co. v. Podocheene, 221 F.Supp.2d 1070, 1088 (D. Ariz.

2002)(enjoining prosecution of action nonmember brought in Native American tribal court

following vehicle accident on reservation pending district court's decision as to jurisdiction of

tribal court); Herman v. Fashion Headquarters, Inc., 992 F.Supp. 677 (S.D.N.Y. 1998)(Secretary

of Labor entitled to injunction against garment manufacturer who failed to pay wages or

overtime as provided in the FLSA).

   The right to injunctive relief is most imperative and clear in cases in which the

deprivation is of a constitutional right.  See, e.g., Government Suppliers Consolidating Services

v. Bayh, 975 F.2d 1267 (7th Cir. 1992), cert. denied, 506 U.S. 1053 (1993)(enjoining state

statute declared to be in derogation of Commerce Clause); Valero Terrestrial v. Caperton, 36

F.Supp.2d 724 (N.D.W.Va. 1994)(declaratory judgment enjoining state solid waste statutes for

violation of Commerce Clause); Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290

(D.C. Cir. 2006)(enjoining the United States Navy's violation of establishment clause through

retaining only Catholic chaplains past the applicable age limits); Heideman v. South Salt Lake

18

City, 348 F.3d 1182 (10th Cir. 2003)(1st Amendment); Abu-Jamal v. Price, 154 F.3d. 128 (3d Cir.

1998)(1st Amendment); Counsel of Alternative Political Parties v. Hooks, 121 F.3d. 876 (3d Cir.

1997)(enjoining New Jersey statute governing filing of nominating petitions for alternative party

candidates); Marcus v. Iowa Public Television, 97 F.3d. 1137 (8th Cir. 1996)(enjoining public

television station from excluding candidates for the United States Congress from televised

appearances before panel of reporters); New York State Bar Ass'n v. Reno, 999 F.Supp. 710

(S.D.N.Y. 1998)(1st Amendment); Elrod v. Burns, 427 U.S. 347 (1976)(1st Amendment).

Federal preemption claims are based upon federal rights, over which federal

courts have jurisdiction under 28 U.S.C. § 1331, precisely because preemption itself is

predicated upon the Supremacy Clause of the United States Constitution, thereby necessarily

presenting an actionable federal claim of constitutional dimension. See, e.g., Shaw v. Delta

Airlines, Inc., 463 U.S. 85, 96 (1983); Smith v. Kansas City Title & Trust Co., 255 U.S. 180

(1921); Louisville & Nashville Ry. Co. v. Mottley, 211 U.S. 149, 152 (1908). Injunctive relief is

also of paramount importance in connection with preserving the constitutional balance between

the federal and state systems, particularly in areas in which Preemption and the Supremacy

Clause attach. See, e.g., Morales v. Transworld Airlines, Inc., 504 U.S. 374 (1993)(enjoining

states from enforcing fare guidelines alleged to be preempted by federal law).

As was his want, Judge Friendly boiled down the verbiage pursuant to which

applications for injunctive relief were measured in instances in which defendants are alleged to

violate a statute:

> A plaintiff asking an injunction because of the defendant's violation of the statute is not
> required to show that otherwise rigor mortis will set in forthwith; all that "irreparable
> injury" means in this context is that unless an injunction is granted, the plaintiff will
> suffer harm, which cannot be repaired." Studebaker Corp. v. Gittlin, 360 F. 2d 692, 698
> (2d Cir. 1996).

19

So, too, here.

Those principles attach to authorize injunctions to bar or prohibit threatened civil and even criminal actions. In Mesa Petroleum Co. v. City's Serv. Co., 715 F. 2d 1425 (10th Cir. 1983), the court affirmed the trial court's grant of a preliminary injunction barring prosecution under the Oklahoma Take-Over Bid Act even after bids were withdrawn, due to a potential threat of renewed prosecution. In this regard, federal courts have enjoined state criminal statutes, even though no prosecution has been instigated, in circumstances in which the threat of great and immediate irreparable injury exists and no other adequate remedy is available. See., e.g., Wooley v. Maynard, 430 U.S. 705 (1977); Doran v. Salemn, Inc., 420 U.S. 922 (1975) Dombrowski v. Pfister, 380 U.S. 479 (1965); See, Watson v. Buck, 313 U.S. 387, 400 (1941); Spielman Motor Sales Co. v. Dodge, 295 U.S. 89, 95 (1935); In re Lustron Corp., 184 F.2d. 789 (7th Cir. 1950), cert. denied, 340 U.S. 946 (1951), holding that courts have the jurisdiction to enjoin all proceedings impinging the court's functions of administering an estate.

Here, Plaintiffs do not seek to enjoin a criminal prosecution. None has been instituted. Plaintiffs do not seek to enjoin a state civil action. None has yet been instituted, although the State Attorney General claims that he has already found state law violations. Rather, Plaintiffs seek a judgment decreeing that preemption bars the United States Attorney General from further investigation and any prosecution of any claims based in whole or in part upon his construction or interpretation of the Form ETA-750 certification/contract between Dreamland and the USDOL and USDHS, and that the determination whether there is a breach by Dreamland of any provision of the contract lies solely within the federal departments and agencies, with penalties if any to be meted out as they alone or with the United States Department of Justice determine; moreover, Plaintiffs' seek to have these declarations set forth in

20

an injunction until final disposition of this matter can occur, in order to maintain the status quo

ante and avoid irreparable harm. Indeed, as is set forth below, injunctive relief in connection

with applications for declaratory judgment is a preferred vehicle to accomplish this result.

### B.    Injunctions May Issue to Enforce the Declaratory Judgment Remedy

The Declaratory Judgment Act, 28 U.S.C. § 2201, is the statutory mechanism

authorizing the courts of the United States to declare the rights and relations of interested parties

in cases of actual controversies. The statute reads in relevant part:

> In a case of actual controversy within its jurisdiction…any court of the United States,
> upon the filing of an appropriate pleading, may declare the rights and other legal relations
> of any interested party seeking such declaration whether or nor further relief is or could
> be sought. Any such declaration shall have the force and effect of final judgment or
> decree and shall be reviewable as such.

It has long been the law that the declaratory judgment remedy may be obtained

through an application for an injunction. In this regard, the Supreme Court has determined that

injunctive relief enforcing a declaratory judgment was appropriate in a case eerily similar to that

at bar.

In Morales v. Transworld Airlines, Inc., 504 U.S. 374 (1992), the Supreme Court

affirmed the trial court's injunction barring state attorneys general from using their state's

statutes and state's common law to enforce state views that airlines were engaging in deceptive

practices, based upon grounds of preemption. In Morales, the Federal Aviation Act had given

the Civil Aeronautics Board the authority to regulate interstate airfares and take administrative

action against certain deceptive trade practices. The statute did not expressly preempt state

regulation however; indeed, the Act contained a "savings clause" providing that "nothing… in

this chapter shall in any way abridge or alter the remedies now existing at common law or by

statute, but the provisions of this chapter are in addition to such remedies."

Congress later enacted the Airline Deregulation Act, which act was intended to bar states from enforcing any law "relating to rates, routes, or services" of air carriers; however, the Act retained the saving clause *in haec verba*.

Thereafter, the National Association of Attorneys General ("NAAG"), whose members included the attorneys general of all fifty states, several territories and the District of Columbia, adopted Air Travel Industry Enforcement Guidelines. The Guidelines contained detailed standards purporting to govern the content and format of airline advertising and the awarding of premiums to frequent flyers, and the payment of compensation to passengers voluntarily yielding their seats on overbooked flights. The attorneys general of seven states then sent a memorandum to the major airlines announcing that many carriers were not adhering to the attorneys general's Advertising Guidelines, and that each such failure "is a violation of our respective state laws on deceptive advertising and trade practices". The seven attorneys general thereafter sent formal notices of intent to sue the airlines for their advertising practices which the attorneys general claimed violated various state laws.

The airlines thereupon filed a declaratory judgment action in federal court, claiming that the threatened state litigation constituted state regulation of their advertisements, which was preempted by the Federal Act, and requested an injunction restraining the attorneys general from taking any action under the various state deceptive practice statutes and common law causes of action that would regulate the airlines' rates, routes, services or their advertising and marketing.

The trial court entered the preliminary injunction, which injunction was affirmed by the Court of Appeals and the Supreme Court. In so affirming, the Supreme Court first held that the entry of injunctive relief in furtherance of the declaratory judgment was necessary and

22

proper, in view of the state attorneys general having sent notices of intent to sue, thereby

initiating a civil proceeding that would violate the Constitution due to preemption, even though a

challenge after the actions had been filed could well have resulted in the state claims for relief

being held unconstitutional on grounds of preemption.  In this regard, the Supreme Court opined:

> In Ex parte Young 209 U.S. 123 156 (1908), we held that [equity
> not acting in face of adequate remedy at law] does not prevent
> federal courts from enjoining state officers who threaten and/are
> about to commence proceedings, either of a civil or criminal
> nature, to enforce against parties affected by an unconstitutional
> act, violating the Federal Constitution.  When enforcement actions
> are imminent – and at least when repetitive penalties attach to
> continuing or repeated violations and the moving party lacks the
> realistic option of violating the action once and raising its federal
> defenses – there is no adequate remedy at law.  Morales, *supra*,
> 504 U.S. at 381.

The Supreme Court deemed Ex parte Young controlling, establishing the airlines'

right to injunctive relief restraining the attorneys general from acting in view of the attorneys

general notices of violations of state laws and intent to sue based upon them:

> We think Young establishes that injunctive relief was available
> here.  As we have described, the attorneys general...had made
> clear that they would seek to enforce the challenged portions of the
> Guidelines (those concerning fair advertising) through suits under
> their respective state laws, and Texas law, at least, imposes
> additional liability (by way of civil penalties in consumer
> treble/damages actions) for multiple violations...Like the plaintiff
> in Young, then, respondents were faced with a Hobson's choice:
> continue to violate the Texas law and expose themselves to
> potentially huge liability, or violate the law once as a test case and
> suffer the injury of obeying the law during the pendency of the
> proceedings and any further review.  Morales, *supra*, 504 U.S. at
> 381.

So, too, here.  The New York Attorney General has represented, both orally and

in writing, that he has found violations in connection with his investigation.  He has threatened

the initiation of civil and potentially criminal actions.  The judgment plaintiffs here seek is to

23

fend off such proceedings, based on preemption, enforced through the mechanism of a declaratory judgment injunction. Thus, Morales is controlling.

With respect to the merits, Morales held that, despite the savings clause remaining in the Airline Deregulation Act, preemption nonetheless attached; as a result, Morales held that all suits based upon various state law claims for violations of the fair advertising provisions of the NAAG Guidelines were preempted, and affirmed the judgments of the Court of Appeals and Trial Court insofar as they awarded injunctive and declaratory relief with respect to any such suits filed based upon those provisions. The district court had enjoined the attorneys general not only from using state laws to enforce the fair advertising sections of their guidelines, but also from initiating any enforcement action seeking to regulate or restrict "any aspect of the plaintiff airline's airfare advertising or other operations involving their rates, routes, and/or services." Since no suit had been threatened regarding airlines' other operations, routes, and/or services, injunctive relief was deemed improper because "in suits such as this one, which the plaintiff intends as a 'first strike' to prevent a State initiating a suit of its own, the prospect of state suit must be imminent, for it is the prospect of that suit which supplies the necessary irreparable injury". Morales, supra, 504 U.S. at 382. The court therefore vacated that portion of the injunction barring the initiation of enforcement actions that had not been threatened.

No such problem here exists, because the declaration and injunction that Plaintiffs seek are narrowly tailored precisely to proceedings based upon the State Attorney General's unique view of Dreamland's ETA-750 certifications/contracts with the USDOL and USDHS.

Morales does not stand alone. Where threatened action by the government is concerned, the Supreme Court does not require that a plaintiff expose himself to liability before bringing suit to challenge the basis for the governmental threat, particularly where the threat

24

arises from an unconstitutional act of the government. For example, in Terrace v. Thompson, 263 U.S. 197, 216 (1923), upon the state threatening plaintiff with forfeiture of his farm, and fines and penalties were he to enter into a lease with an alien in violation of a state anti-alien land law, the Supreme Court did not require that plaintiff sign the lease as a prerequisite to testing the validity of the law by a suit for an injunction. See also, Village of Euclid v. Ambler Realty Co., 272 U.S. 365 (1926); Ex parte Young, 209 U.S. 123 (1908). Similarly, in Steffel v. Thompson, 415 U.S. 452, 458-60, 480 (1974),[9] the Supreme Court did not require that a plaintiff distribute handbills in violation of a state statute precluding such distribution and thereby risk prosecution, before he could seek a declaratory judgment regarding the constitutionality of the state enactment because "the declaratory judgment procedure is an alternative to pursuit of the arguably illegal activity". Indeed, the coercion of being forced to choose between abandoning the right or risking prosecution is "a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate". Abbot Laboratories v. Gardner, 387 U.S. 136, 152 (1957).

No wonder that the declaratory judgment relief is supported through applications for injunctions. Indeed, evolving Supreme Court principles of jurisdiction have applied the Declaratory Judgment Act to find an actual controversy in instances in which a plaintiff's self-avoidance of imminent injury is coerced by threatened enforcement action of even a private party, and not the government. See, e.g., Medimmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007) (patent licensee not required to terminate or breach license agreement prior to seeking declaratory judgment of patent invalidity).

Where, as here, plaintiffs have sought declaratory relief as well as injunctive relief, the district court has "the duty to decide the appropriateness and the merits of the

---

[9]    Steffel had initially filed for injunctive relief, as well as declaratory judgment. After the trial court had denied both, Steffel appealed only the denial of declaratory relief.

25

declaratory request irrespective of its conclusion as to the propriety of the issuance of the injunction". Zwickler v. Koota, 389 U.S. 241 (1967); Roe v. Wade, 410 U.S. 113, 166 (1973); Steffel, supra, 415 U.S. at 468-469; Super Tire Engineering Co. v. McCorkle, 416 U.S. 115 (1974).

Moreover, where questions of preemption are raised, even the filing of an action in a state court does not preclude the lower federal courts from rendering the initial determination of preemption, and therefore rendering appropriate the grant of declaratory and injunctive relief. For example, in Beneficial National Bank v. Anderson, 539 U.S. 1 (2003), twenty-six taxpayers who had pledged their anticipated tax refunds to obtain short-term loans from Beneficial National Bank, filed a state court action against the bank, seeking compensatory and punitive damages for the bank charging interest rates they claimed were usurious under state law. Even though the complaint did not refer to any federal law, Beneficial removed the case asserting that it was a national bank, chartered under the National Bank Act, and that the rates of interest it had charged were in compliance with the rates of interest that national banks could charge pursuant to federal statute.

In reversing the court of appeals, the Supreme Court held that the National Bank Act provided the exclusive cause of action for any allegation of usury against the chartered national bank, and that any state-law-based claim of usury was preempted, so that the state court action was properly removed. In so ruling, the Supreme Court adumbrated that where certain areas of the law had been preempted, there can be no state law based claims, and therefore, any state court action purporting to raise such claims was perforce removable to federal court.[10]

_____

[10]    Beneficial itself identified preempted federal areas of law which perforce bar any state court actions or enforcements to include the entirety of The Labor Management Relations Act, Avco Corp. v. Machinists, 390 U.S. 557 (1968); nuclear accidents and nuclear incidents under the Price-Anderson Act, El Paso Natural Gas Co. v.

26

Thus, as set forth in <u>Beneficial</u>, where federal statutes preempt state law based claims for relief, any state law claim that comes within the scope of the federal statute is in reality based on federal law even if pleaded in terms of state law, and therefore is preempted. <u>Beneficial</u>, *supra*, 539 U.S. at 7.

In holding that the National Bank Act preempted state law and provided the exclusive cause of action for claims of usury regardless of state law, <u>Beneficial</u> cited a long line of cases precluding state-based claims for relief that were contrary, supplemental, inconsistent or even consistent with federal statutes, and then warned that the special nature of federally-chartered banks cried out for uniform rules limiting the potential for such banks to be exposed to varying and various state law based claims for relief, and prescribing exclusive remedies available to depositors alleging bank overcharges, as essential to avoid chaos and confusion:

> [This] court has also recognized the special nature of federally chartered banks. Uniform rules limiting the liability of national banks and prescribing exclusive remedies for their overcharges are an integral part of a banking system that needed protection from 'possibly unfriendly state legislation'. <u>Tiffany v. National Bank of Mo.</u>, 18 Wall 409, 412 (1874). These same federal interests that protected national banks from state taxation that Chief Justice Marshall characterized as the 'power to destroy', <u>McCullough v. Maryland</u>, 4 Wheat. 316 (1819), support the established interpretation of [federal statutes] that give those provisions the requisite preemptive force to provide removal jurisdiction....[Because the statutes] provide the exclusive cause of action for such claims, there is, in short, no such thing as a state law claim of usury against a national bank. <u>Beneficial</u>, *supra*, 539 U.S. at 7.

It is respectfully submitted that the authorities compel the conclusion that plaintiffs are entitled to the declaratory judgment that they seek.

---

<u>Neztsosie</u>, 526 U.S. 473 (1999); and ERISA, <u>Metropolitan Life Ins. Co. v. Taylor</u>, 481 U.S. 58 (1987). There are others as well, some of which are totally preempted and some of which are preempted in part.

27

**C.      Preemption Precludes the Attorney General from Pursuing or Prosecuting the Matter Under Investigation**

Having established that declaratory judgment is the appropriate vehicle to obtain the adjudication sought by Plaintiffs, and that an injunction is the appropriate mechanism to enforce the relief to which Plaintiffs are entitled, Plaintiffs will now explore the authorities manifesting beyond peradventure that the New York State Attorney General is affirmatively precluded from investigating or prosecuting the matter he has represented, both orally and in writing, to be under investigation.

The New York State Attorney General has represented that it believes that Plaintiffs have and are engaging in repeated fraudulent and illegal acts, and have demonstrated persistent fraud and illegality in payments of wages to the H-2B employees of the traveling carnival. The New York State Attorney General has repeatedly represented, both orally and in writing, that the "fraud" and "persistent illegality" consists entirely of Plaintiffs' alleged failures to pay temporary, seasonal alien workers a "prevailing wage" as compensation as is set forth in the preprinted paragraph 23(b) of the Forms ETA-750, the certification of Plaintiff Dreamland Amusements, Inc. with the USDOL and USDHS, which certification the State Attorney General claims is a contract. The New York State Attorney General claims it has the power under New York Executive Law 63(12) to investigate and prosecute the "repeated fraudulent and illegal acts" and "persistent fraud and illegality" under state law, and has acknowledged it could well bring criminal proceedings against Plaintiffs under New York Executive Law 63.

Contrary to the position asserted by the Attorney General, such investigation and prosecution are acts which the New York State Attorney General may not undertake. Indeed, as is set forth below, he is affirmatively barred from investigating or proceeding in the first instance, and may not use state laws to do an end run around federal preemption.

28

The Supremacy Clause of the United States Constitution provides that the laws of the United States shall be "the supreme law of the land". U.S. Const. Art. VI., cl. 2. It is well established that Congress possesses the power to preempt state law. Congress may preempt state law by an explicit mandate contained in the federal enactment of law or by indicating an intent to occupy the field of regulation and thereby displace any and every state law on the same subject. Morales, *supra*; Brown v. Hotel & Rest. Employees & Bartenders, 468 U.S. 491 (1984).

Indeed, even in instances in which Congress has not expressly or impliedly evidenced an intention to occupy a field, courts may nonetheless determine that state laws are displaced to the extent that they conflict with the carrying out of federal laws. Such conflicts between state and federal laws exist when compliance with state law "stands as an obstacle to the accomplishment of execution of the full purposes and objectives of Congress". Morales, *supra*; Brown, *supra*, 468 U.S. at 501.

Based upon these concepts, the Supreme Court has created broad rules of preemption to preclude state intrusions on federal laws, to avoid conflicts or inconsistencies with state rules of law, or with state remedies or with state administration of the federal laws, e.g., San Diego Bldg. Trades Council, etc. v. Garmon, 359 U.S. 236, 242 (1969).

The potential inimical results from potential conflicts of rules of law are that each state will require different behavior than that prescribed by the federal law. The danger from intrusions regarding differing remedies is that the various states may provide for differing consequences for the same actions or penalize conduct the federal law authorizes, or allow that which federal law precludes. The problems arising from intrusions on federal administration of a statutory scheme are that Congress's design to entrust questions to the experts to whom it had delegated resolution can be undermined and indeed erased through states purporting to exercise

29

jurisdiction over the same questions.  See, e.g., Healthcare Ass'n of New York State, Inc. v.

Pataki, 471 F. 3d 87, 94-95 (2d Cir. 2006).

      In order to guard against any of these three potential conflicts, each of which

would undermine the federal statutory and regulatory regime, Garmon held that state laws and

regulations are preempted "[w]hen it is clear or may be fairly be assumed that the activities

which a State purports to regulate are protected by the federal enactment or constitute a violation

under the federal enactment."  Garmon, supra, 359 U.S. 236, 244[11]; Hoffman Plastic

Compounds, Inc. v. NLRB, 535 U.S. 137, 147-48 (2002)(denying to the federal NLRB the

power to award back pay to unauthorized aliens in view of the INA).

      Thus, under Garmon, states may not regulate activity that the statute protects,

prohibits or even arguably protects or prohibits.  Wisconsin Dept. of Indus., Labor & Human

Relations v. Gould, 475 U.S. 282, 286 (1986).  This broad preclusion principle has been utilized

to preempt state action even where the state act was substantive, remedial, and consistent with

the primary jurisdiction of the federal government and it agencies [Livadas v. Bradshaw, 512

U.S. 107, 116-117 (1994)(state law held preempted because it conflicted with federal labor law);

Gould, supra, 475 U.S. at 287-288 (state regulation preempted even though it augmented the

remedies provided by federal statute); Garmon, supra, 359 U.S. at 244 (state tort claim

preempted even though NLRB declined jurisdiction over actions arguably prohibited by

NLRA)].  In this regard:

> If the state law regulates conduct that is actually protected by
> federal law…preemption follows not as a matter of protecting
> primary jurisdiction, but as a matter of substantive right".  Brown
> v. Hotel & Rest. Employees & Bartenders, 468 U.S. 491, 503
> (1984).

---

[11]    In this regard, it is noteworthy that Garmon required that federal courts as well as state courts must defer to
the NLRB for questions arguably arising under Sections 7 or 8 of the National Labor Relations Act.

528611-1

So, too, here.

Indeed, the concerns expressed by the Supreme Court regarding potentially inconsistent conflicts of remedies and dualities of administration for the same acts have resulted in numerous holdings of the Supreme Court preempting state actions based on tort or common law principles or state statutes. See, e.g., American Airlines, Inc. v. Wolens, 513 U.S. 219 (1995)(Illinois consumer fraud act preempted by federal airline deregulation act); Morales, supra; Cipollone v. Liggett Group, Inc., 505 U.S. 504 (1992)(state law fraudulent misrepresentation claim against cigarette manufacturer preempted by federal cigarette labeling and advertising act); Wisconsin Dept. of Indus., Labor & Human Relations v. Gould, 475 U.S. 282 (1986)(Wisconsin statute debarring employer from contracts with state based on repeated violations of NLRA is preempted by the penalties provisions of the NLRA).

In Metropolitan Life Co. v. Taylor, 481 U.S. 58, 63 (1987), the Supreme Court affirmed the removal to federal court of state contract and tort claims, holding that the substance of those state claims had been preempted by the Employee Retirement Income Security Act. Similarly, in Oneida Indian Nation v County of Oneida, 414 U.S. 661, 675 (1974), the Supreme Court affirmed the removal to federal court of a state law complaint averring a present right to possession of Native American tribal lands because it necessarily was bottomed upon a right under federal law, and was completely preempted.

The same tenets and logic apply to the regulation of immigration and employment of aliens. The Secretary of Homeland Security, the Attorney General of the United States, and the Secretary of the Department of Labor have had vested in them the "administration and enforcement of the chapter and all other laws relating to the immigration and nationalization of aliens." See, 8 U.S.C. § 1102(a). The powers so vested are virtually coextensive with the power

31

528611-1

to regulate immigration. See, 8 U.S.C. § 1103, including (g) thereunder; 8 U.S.C. § 1324(a)(h)(2).

  A sub-set of that broad grant of power is found within 8 U.S.C. § 1184 headed "Admission of Non-Immigrants". Pursuant to that statute, at subsection (a), the admission of any alien as a non-immigrant "for such time and other such conditions" as the Federal Executive Branch may prescribe is squarely-bottomed. Within that section are provisions imposing fraud prevention and detection fees upon employers filing false Forms ETA-750 and other petitions. 8 U.S.C. § 1184(c)(13)(A) and (B). This statute also empowers the Secretary of the Department of Homeland Security[12] to hold hearings and, after notice and an opportunity to be heard, impose fines and penalties upon an employer who submits false or fraudulent applications in order to obtain, *inter alia*, H-2B employees. See, e.g., 8 U.S.C. § 1184(c)(14)(A).

  The United States Code of Federal Regulations contains more than thirty pages addressing only seasonal alien temporary workers. 8 CFR § 214.2(h)(1), et seq., sets forth the obligations of employers of H-2B workers and the effect and consequences of adhering to or breaching the ETA-750.

  The Secretary of Labor and thereafter the Secretary of the Department of Homeland Security and their federal designees, have both the power and jurisdiction to approve H-2B contracts and thereafter enforce and investigate each and every instance in which the petitioning employer has failed to meet the statutorily required contractual conditions for obtaining the seasonal alien laborers. Indeed, under § 214.2(h)(11)(B), the Director may revoke

---

[12]   Notably, although the Secretary of the Department of Homeland Security may, by 8 U.S.C. sec. 1184(c)(14)(B), delegate to the Secretary of Labor these investigative and enforcement duties and rights, the Department of Homeland Security has, to date, chosen not to do so. Rather, the Department of Homeland Security, in a clear indication of its desire to maintain its exclusive authority over this area of immigration regulation, has solely retained the rights of investigation and enforcement.

32

a petition at any time, even after its expiration, based upon the petitioner's statement of facts

contained in the petition being "not true and correct" or if the petitioner has "violated the terms

and conditions of the approved petition" or any of the other standards set forth therein.

It is not surprising that every Court which has considered the issue has determined

that the comprehensive federal scheme preempts any state regulation, even if non-conflicting or

parallel, and that there is no private right of enforcement. See, e.g., Hines v. Davidowitz, 312

U.S. 52, 66-67 (1941) (striking down a Pennsylvania alien registration statute on grounds of

federal pre-emption, observing "where the federal government in the exercise of its superior

authority in this field, has enacted a complete scheme of regulation ... states cannot,

inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the

federal law, or enforce additional or excilarary regulations."); Takahashi v. Fish & Game

Comm'n, 334 U.S. 410, 419 (1948)("states can neither add to nor take from the conditions

lawfully imposed by Congress upon admission, naturalization and residence of aliens in the

United States or the several states."); accord Perry v. Thomas, 482 U.S. 483 (1987); DeCanas v.

Bico, 424 U.S. 351, 355 (1976); Spina v. Department of Homeland Sec., 470 F.3d 116, 127-28

(2d Cir. 2006)(using federal law to construe applicability, if any, of Connecticut statute to federal

sentencing enhancement guidelines because, *inter alia*, "the immigration laws contain no

provision indicating that they are to be interpreted in accordance with state law."); Chavez v.

Freshpict Foods, Inc., 456 F.2d 890, 893-96 (10th Cir. 1972), cert. denied, 458 U.S. 92 (1973);

Arizona Contractors Ass'n, Inc. v. Candelaria, 534 F.Supp.2d 1036 (D. Ariz. 2008); Lozano v.

City of Hazleton, 496 F.Supp.2d 477, 517-528 (M.D.Pa. 2007); Shah v. Wilco Systems, Inc., 126

F.Supp.2d 641, 648-49 (S.D.N.Y. 2000); United States v. Richard Dattner Architects, 972

F.Supp. 738, 742 (S.D.N.Y. 1997); Chavez v. Freshpict Foods, Inc., 322 F.Supp. 146 (D.Colo.

1971); Younus v. Shabat, 336 F.Supp. 1137, 1140 (N.D.Ill. 1971); see Gade v. Nat'l Solid Waste Management Assoc., 505 U.S. 88, 108 (1992).

And, without a private cause of action, there is no "parens patriae" jurisdiction permitting the State Attorney General to become involved in the matters he states are under investigation. The remedies are distinctly federal. See, e.g., Castellanos-Contreras v. Decatur Hotels, LLC, 488 F.Supp.2d 565 (E.D. La. 2007).

In stark contrast, there is not a single case that holds that a state attorney general has the power or standing to use any state based statute or common law cause of action to pursue a person or entity for alleged false statements to the United States Department of Labor to obtain seasonal workers or alleged breaches of such certifications or contracts.

Not surprisingly, given the breadth and extent of the scheme crafted by Congress and implemented through hundreds of pages of federal statutes and regulations, there are very few cases which discuss the preemptive effect of the Immigration and Naturalization Act provisions governing and attaching to the employment of temporary seasonal workers under H-2B visas. Not surprisingly, in view of the wide swath cut by the federal statutes and regulations encompassing all aspects of employment of H-2B workers, including administrative, civil and criminal penalties for false and fraudulent applications on Forms ETA-750 by employers, the extant case law establishes that preemption attaches so that no state contract, tort, common law or statutory remedies survive.

Illustrative is Choimbol v. Fairfield Resorts, Inc., 2006 WL 2631791 (E.D.Va. September 11, 2006). Plaintiffs were H-2B workers hired by and for defendant employer to perform laundry, housekeeping and other maintenance services at Fairfield Resorts. Fairfield was not an exempt FLSA enterprise and was therefore required to pay FLSA wages and

34

overtime. The H-2B workers filed suit, claiming that Fairfield knowingly delayed paying them their hourly wages, and manipulated and falsified their hourly wage rates. The H-2B workers sought minimum wage and overtime compensation under the FLSA, and also filed state law claims of unjust enrichment and fraud, together with a federal civil RICO claim.

In an analysis compelled by the law set forth above, and which sounds the death knell of the position of the Attorney General in the matter at bar, the court found that preemption precluded the Plaintiffs from proceeding with any of their non-FLSA claims. In this regard, Choimbol held that the state claims based upon common law were preempted. Choimbol, supra, 2006 WL 2631791 *5. See, Lerwill v. Inflight Motion Pictures, Inc., 343 F.Supp. 1027, 28 (N.D.Ca. 1972)(even though the legislative history of the FLSA does not expressly provide for preemption "a clearer case of implied intent to exclude other alternative remedies by the provision of one would be difficult to conceive").

Reasoning that the FLSA directly addresses and provides relief for the allegations made by the H-2B plaintiffs "in this case: overtime and minimum wage compensation," the Court held that "plaintiffs cannot circumvent the exclusive remedy provided by Congress by asserting equivalent state law claims in addition to the FLSA claim." Choimbol, id. at *5. See also Nettels v. Techplan Corp., 704 F.Supp. 95, 100 (D.S.C. 1998)(holding that plaintiff's common law tort claims were preempted by the FLSA because the statute provided the right to recover overtime wages); Moeck v. Gray Supply Corp., 2006 WL 42368, at 1-2 (D.N.J. Jan. 6, 2006)(dismissing state law fraud claim alleging material misrepresentation regarding entitlement to overtime in view of FLSA); Chen v. Street Beat Sportswear, Inc., 364 F.Supp.2d 269 (E.D.N.Y. 2005)(common law fraud and negligent misrepresentation claims were preempted because directly covered by the FLSA).

35

The H-2B plaintiffs' assertions of civil RICO violations fared no better. Despite the absence of a case directly on point, the Choimbol Court reasoned that the remedial schemes of both RICO and the FLSA provided compelling logic that RICO claims were precluded:

> The FLSA provides a sufficiently punitive scheme to address the Defendants' misconduct in this case. In Kendall v. City of Chesapeake, the Fourth Circuit relied on this rationale to uphold the District Court's finding that the Plaintiff's independent claims under Section 1983 were precluded by the 'comprehensive enforcement scheme that is incompatible with the individual enforcement under Section 1983.' 174 F.3d 437, 443 (4th Cir. 1989). Similar to the analysis applied with respect to whether the FLSA preempts parallel, common law claims, the court noted that the FLSA's 'unusually elaborate' enforcement scheme manifested Congress's desire to exclusively define the private remedies available to redress violations of the statute's terms. Id. at 443. See also Zombro v. Baltimore City Police Department, 868 F.2d 1364, 1366 (4th Cir. 1989). Choimbol, 2006 WL 2631791 at *6.

Finding that the FLSA provides a careful blend of administrative and judicial enforcement powers which include criminal penalties for willful violators, and relying on a spate of other cases that had precluded plaintiffs from proceeding with RICO claims in view of extensive remedies provided under other federal statutory schemes such as the Federal Energy Reorganization Act and the Federal Social Security Act, Choimbol found the Federal RICO claim are necessarily preempted.

Choimbol's holding and analysis are dispositive of the instant motion. In view of the FLSA, every state based claim for relief premised upon alleged failures of employers to pay H-2B workers the requisite hourly and overtime wages is preempted, be it created by statute or based on common law. Moreover, in view of the FLSA, any other federal claim based upon failures of employers to pay requisite hourly and overtime wages to H-2B workers is also preempted. The H-2B workers are relegated to their FLSA remedy.

Here, there is no FLSA remedy because, as set forth supra, Dreamland is an exempt amusement enterprise, so that the wages, hours, and overtime strictures of the FLSA do not attach to Dreamland or its H-2B employees. Were there any question regarding the applicability of the FLSA or the scope of its exemption, or the wages due to H-2B workers from FLSA exempted enterprises, then the answer and remedy lies with the United States Department of Labor.

Yet, at bottom, due to preemption, there are no state statutory or common law claims that the New York State Attorney General has the right to pursue. In view of preemption, he lacks the authority to investigate, much less prosecute, whether an alleged failure by Dreamland to pay prevailing wages to H-2B workers pursuant to its certification/contract with the United States Departments of Labor and Homeland Security is a violation of New York Executive Law 63(12), or any other New York statute or common law claim for relief. The New York State Attorney General lacks the power to investigate, much less prosecute, whether Dreamland has violated its certificate/contract with the United States Department of Labor with respect to the wages it has and is paying to the H-2B employees that travel with its mobile carnival.

Both the substance of the curiosity of the New York Attorney General and the task of enforcing that subject lie wholly within the rights, powers and duties of the United States. As a result, the investigation of the New York State Attorney General is beyond those it has the lawful right to pursue. All Dreamland seeks is an adjudication and order so declaring and enforcing the law.[13]

---

[13]    See, United States v. Richard Dattmer Architects, 972 F.Supp. 738, 744 (S.D.N.Y. 1997)(since the "administration and enforcement of the INA is specifically delegated and entrusted to certain federal officials, federal departments, and federal agencies, ... the question of importing any alien as a non-immigrant under Section 1101(a)(15)(H) ... of this title in any specific case or specific cases will be determined by the Attorney General, after

37

Similarly instructive is the Second Circuit's Opinion in Grochowski v. Phoenix
Const., 318 F.3d 80 (2d Cir. 2003). In Grochowski, construction workers sued for recovery of
unpaid wages and overtime pay under the FLSA, the Davis-Bacon Act, the Contract Work Hours
and Safety Standards Act, and state common law. The trial court dismissed the state common
law claims and all federal claims apart from the FLSA, on grounds of preemption and exclusive
jurisdiction.

In affirming the trial court, and particularly, the dismissal of all state law claims
for recovery of unpaid wages and overtime pay, the Second Circuit relegated the plaintiffs to
their Fair Labor Standards Act remedy, deeming it exclusive even though the contracts under
which the workers had been employed had specifically adopted as general conditions the wage
rates and supplemental fringe benefits prevailing under the Davis-Bacon Act and the Contract
Work Hours and Safety Standards Act.

With respect to the plaintiffs' state law claims for breach of contract and quantum
meruit, the Second Circuit first concluded that the Davis-Bacon Act did not confer a private right
of action to an aggrieved employee for back wages because neither that Act nor the CWHSSA
expressly so provided. Deeming it a "elemental cannon of statutory construction," the Second
Circuit had no problem holding that the absence of an express provision in the federal DBA
creating a private right of action compels the conclusion that the extent FLSA remedies Congress
did provide are appropriate and exclusive. Grochowski, *supra*, 318 F.3d at 85.

---

consultation with appropriate agencies of the Government, upon petition of the importing employer.). 8 U.S.C. §
1184(c). The imposition of duties on public officials provides further evidence that Congress did not intend to
create a private right of action." See, Younus v. Shabat, 336 F.Supp. 1137 (N.D. Ill. 1978)("in the area of
immigration, the National government has to a great extent preempted the field of legislation, and that to the extent
state laws and regulations are inconsistent therewith, the latter cannot stand.")

38

The Second Circuit also struck any claim for relief premised upon state statutory

or common law violations of wages and hours claimed due and owing precisely because of

preemption and the need to ensure that states were barred from creating end-run remedies around

federal statutory schemes:

> At bottom, the plaintiffs' state-law claims are indirect attempts at
> privately enforcing the prevailing wage schedules contained in the
> DBA. To allow a third-party private contract action aimed at
> enforcing those wage schedules would be 'inconsistent with the
> underlying purpose of the legislative scheme and would interfere
> with the implementation of that scheme to the same extent as
> would a cause of action directly under the statute.' (citation
> omitted). Grochowski, *supra*, 318 F.3d at 86.

The statutes and case law of New York had empowered employees to bring

parallel actions seeking recovery of wages claimed and denied both under legislative enactments

and through common law remedies. Nonetheless, Grochowski foreclosed the plaintiffs from

pursuing such remedies under New York law, holding that those state remedies were inapposite

to plaintiffs' claims:

> [T]he present contracts between the defendants and the NYCHA
> were federally funded and, as such, are governed by the prevailing
> wage requirements set forth in the DBA, not by section 220 of the
> New York Labor Laws. Since in this case ... no private right of
> action exists under the relevant statute, the plaintiffs efforts to
> bring their claims as state law claims are clearly an impermissible
> 'end run' around the DBA. Grochowski, *supra*, 318 F.3d at 86-7.

Grochowski does not stand alone. In Broder v. Cablevision Systems Corp., 418

F.3d 187 (2d Cir. 2005), the Court relied upon Grochowski in sustaining the removal of a

customer's putative class action against a cable television service provider, which suit had

asserted state law claims of breach of contract, common-law fraud, deceptive business practices

and unjust enrichment, and in affirming the trial court's dismissal of each of the state statutory

and common law claims, based upon preemption. Plaintiffs had sued under Section 224(a)(4) of

39

the New York Public Service Law and state common law averring statutory and common law

claims for relief based upon Cablevision's alleged failures to provide uniform rates as required

by federal law, and notice of Winter Season Rates as required under state law, thereby allegedly

violating numerous provisions of New York General Business Law, as well as committing

common law fraud.

Even though the complaint made no mention of any federal statute or right, the

Second Circuit affirmed the trial court's decision to retain the removed action based upon the

presence of the preemption federal question -- whether the state law claims were preempted.

Reasoning that plaintiff could not obtain the declaratory judgment he sought without prevailing

on the issue of whether the federal statute had been violated, the court determined that removal

was both appropriate and necessary.  Relying on <u>Grable & Sons Metal Products, Inc. v. Darue</u>

<u>Engineering & Manufacturing</u>, 545 U.S. 308, 125 S.Ct. 2363, 2366-68 (2005), the Second

Circuit reasoned:

> Cablevision maintains that its provision of Winter Season rates did
> not violate the [federal statutory] uniform rate requirement.
> Cablevision contests, inter alia, whether Broder and the class
> members subscribed in areas that lacked 'effective competition,'
> and whether the Winter Season rates are exempt from the [federal
> statute] uniformity requirement as promotional rates.  These
> questions involves aspects of the complex federal regulatory
> scheme applicable to cable television rates, as to which there is 'a
> serious federal interest in claiming the advantages thought to be
> inherent in a federal forum,' <u>Grable</u>, 545 U.S. at ____, 125 S.Ct. at
> 2367.  These federal issues are not clearly insubstantial, ....
> <u>Broder</u>, <i>supra</i>, 418 F.3d at 195.

Thus, even though the federal statute itself excluded any private right of action to persons such

as Broder, the Second Circuit nonetheless held that no action could proceed in state court based

on the same facts, be it presented as a New York breach-of-contract action or suit under New

York's General Business Law, so that the matter was appropriately within the exclusive purvue of the federal courts.

Reaching the merits, the Second Circuit relied upon <u>Grochowski</u> to hold that no state law suit for breach of the federal statutes could avoid the Federal Act's lack of a private right of action. In so holding, the Second Circuit noted that <u>Grochowski</u> "stands at least for the proposition that a federal court should not strain to find in a contract a state-law right of action for violation of a federal law under which no private right of action exists." <u>Broder</u>, *supra*, 418 F.3d at 198.

<u>Broder</u> as well dismissed the contract claim founded upon New York statutory laws, reasoning that such a construction would thwart the intent of Congress:

> Were we to hold, despite <u>Convoy</u> [v. AT&T Corp., 241 F.3d 242, 258 (2d Cir. 2001)] that [New York State General Business Law] Section 349 may be used to assert a private right of action for violation of a federal law otherwise lacking one, we would essentially be attributing to the New York Legislature and intent to thwart Congress's intentions on a significant scale. ...
>
>                 \* \* \* \*
>
> Neither the text of GBL Section 349 nor any other authority cited by <u>Broder</u> suggests that the New York Legislature intended to cast its net so broadly. <u>Broder</u>, *supra*, 418 F.3d at 199.

The common law fraud claims fared no better before the <u>Broder</u> court, because the absence of any state-based claim precluded the bringing of a common law fraud claim ostensibly based upon it. <u>Broder</u>, *supra*, 418 F.3d at 200-01.

Similarly instructive is <u>Shah v. Wilco Systems, Inc.</u>, 126 F.Supp.2d 641 (S.D.N.Y. 2000). In <u>Shah</u>, former employees sued Wilco for compensatory and punitive damages and injunctive relief arising from Wilco's alleged exploitation of domestic and foreign workers in violation of the Federal Immigration and Nationality Act, Fair Labor Standards Act,

and New York law. Shah had filed a class action complaint averring a comprehensive scheme

by Wilco pursuant to which Wilco imported foreign workers with H-1B visas to displace

domestic workers, paid the foreign workers a salary below prevailing wages, and failed to

adequately train domestic workers or pay them a competitive salary, asserting claims under the

INA, FLSA, and state law claims of discrimination in violation of New York Executive Law 290

and New York City Human Rights Law Sec. 8-107, breach of contract and breach of duty of

good faith and fair dealing.

In response to the defendants' motion to dismiss, the court issued rulings of

significance to the instant matter. First, the court dismissed each of the plaintiffs' claims

predicated upon the alleged violations of the Immigration and Nationality Act, relegating them to

the administrative mechanisms erected by federal statutes and regulations. Even though that Act

did not on its face preclude an aggrieved person from bringing a private right of action, the Shah

court held that the comprehensive administrative scheme under the INA evidenced a clear

intention on the part of Congress to:

> limit the enforcement for alleged violation of Sections 1182(n) and
> 1324(b) to the administrative agencies in charge of the processes,
> and only implicate judicial review once the administrative
> procedure has been exhausted. Nothing in either statutory
> provision indicates that Congress intended to provide a private
> right of action in federal courts to enforce violations of [the federal
> act] in the first instance. In the absence of strong indicia of
> contrary Congressional intent, the Court concludes that these
> statutes, and related regulations, provide 'precisely the remedies
> [Congress] considered appropriate'." Shah, *supra*, 126 F.Supp.2d
> at 648-49.

Shah also facially disposed of the plaintiffs' contention that they had a state

common law right to sue Wilco in tort for its alleged immigration law violations. Reasoning that

the only state law claim was a breach of contract which could not transformed into a tort, and

42

that no such breach of contract could be actionable under any state law for the violation alleged, the court easily dismissed the plaintiff's state common law claims. Shah, supra, 126 F.Supp.2d at 650. Most importantly, Shah adumbrated that even were there a state common law right to sue in court, such right would not provide plaintiffs with a private right of action under federal law. Id.

Of particular note, Shah determined that there was a valid and detailed mechanism created by the federal statute to address each of the issues raised by the plaintiffs -- that is the statutes and regulatory procedures erected thereunder pursuant to the provisions of the Immigration and Nationality Act:

> [T]here are other remedies available to plaintiffs, ... plaintiffs may address Wilco's purported violations pursuant to the administrative procedures outlined supra which are available under [the INA]. In addition to various civil penalties against Wilco, the statutes provide for back pay for nonimmigrant workers. (citations omitted). Shah, supra, 126 F.Supp.2d at 654-55.

Even prior to the extensive and exhaustive amendments to the Immigration and Nationality Act occasioned by, inter alia, 9/11, the few courts asked to consider this issue held that administrative and penal laws enacted by Congress in connection with the areas surrounding the employment of aliens were exclusive, brooking no state cause of action.

In Chavez v. Freshpit Foods, Inc., 456 F.2d 890 (10th Cir. 1972), cert. denied, 458 U.S. 592 (1973), the Court of Appeals affirmed the judgment of a trial court that no private right of action could be implied from the federal regulatory statute governing the employment of non-resident, seasonal workers. In Chavez, domestic workers in Colorado and Texas filed a class action suit averring that 34 agricultural employers had hired Mexican nationals who had illegally entered the United States, thereby depriving the domestic workers of jobs and depressing their wages, claiming violations of the Immigration and Nationality Act particularly

43

with respect to H-2 visas. Finding no express private remedy in the INA, the court would not

deem that the statutory scheme provided an implied remedy.

Of significance to the case at bar, the plaintiffs had contended that the

governmental agencies involved lacked the will or funds to enforce the provisions governing the

employment of H-2 workers. This, not surprisingly, was not deemed a cognizable fount from

which to imply the existence of a claim for relief under any theory, state or federal:

> The appellants contend that the Department of Justice and other
> governmental agencies which are required to enforce the federal
> immigration laws are 'mostly inadequate' and that this court should
> enforce the Act. Accordingly, they seek to by-pass the
> enforcement procedures set forth in the Act. In order to
> accommodate them, this court must 'fashion' or create a private
> right of action and a private remedy even though Congress has
> revealed no intention to do so under the immigration laws. This
> we decline to do. (citations omitted). Chavez, *supra*, 456 F.2d at
> 894.

And similarly:

> This court will not fashion civil remedies from federal regulatory
> statutes except where a compelling federal interest of a
> governmental nature exists where the intent of Congress to create
> private rights can not be found in the statute or in its legislative
> history. Had the Congress intended to create private causes of
> action and private remedies, it was fully capable of directly and
> clearly so providing. (citations omitted). Chavez, *supra*, 456 F.2d
> at 894-95.

Some of these principles were incorporated by the Second Circuit in its decision

in Spina v. Department of Homeland Security, 470 F.3d 116 (2d Cir. 2006). In Spina, an alien

subject to deportation sought credit under Connecticut law for time spent in Connecticut in pre-

conviction detention, which would thereby render him ineligible for deportation. In rebuking

this contention, the court noted that Spina's argument rested on the "flawed assumption" that

Connecticut law controlled the outcome of his petition. In this regard, the court stated:

44

> In fact, the principle is well established that, unless Congress plainly manifests an 'intent to incorporate diverse state laws into a federal statute, the meaning of [a] federal statute should not be dependent on state law.' United States v. Turley, 352 U.S. 407, 411 (1957) (emphasis added); accord, Dickerson v. New Banner Inst., Inc., 460 U.S. 103, 1119 (1983)(noting presumption that 'when Congress enacts a statute, ... it does not intend to make its application dependent on state law'); Spina, supra, 470 F.3d at 127. Accord, Taylor v. United States, 495 U.S. 575, 596 (1990); United States v. Campbell, 167 F.3d 94, 97 (2d Cir. 1999); Sui v. INS, 350 F.3d 105, 114 (2d Cir. 2001).

Illustrative is Castellanos - Contreras v. Decatur Hotels, LLC, 448 F.Supp.2d 565

(E.D. La. 2007). In Castellanos, H-2B non-immigrant alien laborers temporarily employed to

assist in Hurricane Katrina clean-up filed a declaratory judgment action against the employer for

violations of the Fair Labor Standards Act, seeking awards of unpaid wages, liquidated damages,

and attorneys' fees and costs. The court refused to permit the plaintiffs to amend their complaint

to include a breach of contract claim based on the same facts because they were subsumed by the

FLSA claim.

The parties filed cross-motions seeking resolution of the threshold legal issue --

whether the FLSA applied to non-agricultural guest workers brought to the United States under

the H-2B program. In answering the question in the affirmative, the court relied upon an

exhaustive and extensive analysis of the history and content of the H-2B visa program which

analysis undersigned commends to this Honorable Court but will not repeat herein.

Reasoning that by its own terms, the FLSA applied to all employees -- that is to

"any individual employed by an employer," -- and because the protections of the FLSA are

applicable to citizens and aliens alike and whether the alien is documented or undocumented is

irrelevant, the Court found no reason to exclude H-2B guest workers from the protections of the

FLSA. Castellanos, *supra*, 488 F.Supp.2d at 572. See, In re Reyes, 814 F.2d 168, 170 (5th Cir. 1987), cert. denied, 487 U.S. 1235,

Thus, under authorities cited by Choimbol, *supra*, each and every state wage, hour and overtime claim for relief of H-2B workers whether based on statute or common law, is preempted in view of the FLSA, as are certain federal claims as well. Under Castellanos, *supra*, H-2B workers are deemed covered by the FLSA.

These two cases establish beyond per adventure that there are no state based claims for relief regarding wages and hour and overtime claims for H-2B employees. Any such claim is limited to that provided by the FLSA or other federal statute.

Where, as here, the employer is exempt from the FLSA wages and hours provisions as an amusement enterprise under § 213 of the FLSA, then recourse can be obtained solely and exclusively through the administrative provisions surrounding the enforcement of terms and conditions of employment pursuant to the statutory and regulatory scheme within the jurisdiction of the United States Departments of Labor and Homeland Security, with sanctions for repeated "fraud" available through those departments and through the United States Department of Justice.

These avenues of redress are not ineffective. Indeed, they are the very administrative avenues of redress to which the Shah court directed these plaintiffs. Moreover, these remedies are effective as can be attested by Alden Management Services.

Indeed, Alden Management Services was required to pay back pay to H-1A registered nurses for the entire period of their employment, after the nurses had pursued their administrative remedy within the United States Department of Labor's administrative review board. Alden Management Services, Inc. v. Chao, 529 F.Supp.2d 882, 892-93 (N.D.Ill. 2007).

46

Should Dreamland's H-2B employees have any such claim, they too need only pursue their exclusive federal administrative remedy within the United States Department of Labor.

The State Attorney General is preempted. He has no right or power to act, investigate or prosecute. He is also immune from damages under 42 U.S.C. § 1983. Plaintiffs therefore respectfully pray that this Honorable Court act to preserve their rights, since they have no remedy at law to recover from the State Attorney General the time, costs and dislocation visited upon them by the prosecution at issue.

## III.    CONCLUSION

For the reasons set forth hereinafter, Plaintiffs respectfully pray that this Honorable Court enter an Order in the form attached hereto, enjoining the Defendant from investigating and prosecuting the matters set forth herein, based upon preemption and the Defendant's lack of standing.

Respectfully submitted,

TARTER KRINSKY & DROGIN, PC

Edward Finkelstein, Esquire [EF-2805]
1350 Broadway
New York, NY  10018
212-216-8000/FAX - 212-216-8801
*Local counsel for Plaintiffs*

Bruce L. Thall, Esquire
Heather M. Eichenbaum, Esquire
David B. Picker, Esquire [DP-9658]
SPECTOR GADON & ROSEN, PC
1635 Market Street, 7th Floor
Philadelphia, PA  19103
214-241-8888/FAX - 215-241-8844
*Counsel for Plaintiffs*

47

Case 1:08-cv-06321-JGK    Document 1    Filed 08/01/2008    Page 1 of 10

# EXHIBIT "A"

**U.S. Department of Labor**   **Employment and Training Administration**
Chicago National Processing Center
844 N. Rush Street
12th Floor
Chicago, IL 60611



## FINAL DETERMINATION

January 20, 2006

DREAMLAND AMUSEMENTS
c/o Joe A. Nichols
Law Office of Joe A. Nichols, P. A.
1033 W. First Street, Suite B
Sanford, FL 32771

| | |
|---|---|
| ETA Case Number: | C-06020-07301 |
| State Case # | 20050036260 |
| Number of Openings: | 40 |
| | |
| Occupation: | Circus Laborer |
| Period of Certification: | January 05, 2006 - November 01, 2006 |

In reply refer to:     Mary Glusak

The Department of Labor has made a final determination on your application for certification of temporary alien employment pursuant to Title 20, Code of Federal Regulations, Part 655.

The Application for Alien Employment Certification, Form ETA 750A, has been **certified** and is enclosed. All enclosures are required to be submitted to the U.S. Citizenship and Immigration Services, U.S. Department of Homeland Security, at:

> U.S. Department of Homeland Security
> U.S. Citizenship and Immigration Services
> Vermont Service Center
> 75 Lower Weldon St.
> Saint Albans, VT 05479

for consideration with your petition (Form I-129).

The employer is advised if filing for H-2B visas for carnival laborers next year, he must file his application under the guidelines of GAL 1-95 and not the guidelines for entertainers.

Sincerely,

Marie Gonzalez
Certifying Officer

CC: DREAMLAND AMUSEMENTS

Attachments: Form ETA 750A

OMB Approval No. 44-R1301

**U.S. DEPARTMENT OF LABOR**
Employment and Training Administration

**APPLICATION**
**FOR**
**ALIEN EMPLOYMENT CERTIFICATION**

IMPORTANT: READ CAREFULLY BEFORE COMPLETING THIS FORM.
PRINT legibly in ink or use a typewriter. If you need more space to answer questions on this form, use a separate sheet. Identify each answer with the number of the corresponding question. SIGN AND DATE each sheet in original signature.

To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by $10,000 fine or 5 years in the penitentiary, or both (U.S.C. 1001).

**PART A. OFFER OF EMPLOYMENT**

1. Name of Alien  (Family name in capital letter, First, Middle, Maiden)

Multiple Aliens    (40)

2. Present Address of Alien  (Number, Street, City and Town, State ZIP Code or Province, Country)

Not in USA.

3. Type of Visa  (If in U.S.)

The following information is submitted as evidence of an offer of employment.

4. Name of Employer  (Full name of organization)

DREAMLAND AMUSEMENTS

5. Telephone  (Area Code and Number)

516-901-2988.

6. Address  (Number, Street, City or Town, Country, State, Zip Code)

2 Olympia Lane, Stony Brook, NY. 11790

7. Address Where Alien Will Work  (if different from Item 6)

Traveling Carnival on US Tour

| 8. Nature of Employer's Business Activity | 9. Name of Job Title | 10. Total Hours Per Week | | 11. Work Schedule (Hourly) | 12. Rate of Pay | |
|---|---|---|---|---|---|---|
| | | a. Basic. | b. Overtime | | a. Basic | b. Overtime |
| Traveling Entertainment Carnival | Carnival Laborers | 40 | none | 10:00 a.m. 7:00 p.m. | $.310.80 per week. | $ none. per hour |

13. Describe Fully the Job to be Performed  (Duties)

Working with carnival rides and seats, unloading and loading rides, seats, and tents, moving heavy equipment as directed, setting up and taking down rides, seats, and tents.

14. State in detail the MINIMUM education, training, and experience for a worker to perform satisfactory the job duties described in Item 13 above.

15. Other Special Requirements

| EDU-CATION (Enter number of years) | Grade School | High School | College | College Degree Required  (specify) |
|---|---|---|---|---|
| | 0 | 0. | 0. | n/a |
| | | | | Major Field of Study |
| | | | | n/a |

| TRAIN-ING | No. Yrs. | No. Mos. | Type of Training |
|---|---|---|---|
| | 0 | 0 | n/a |

| EXPERI-ENCE | Job Offered | | Related Occupation | | Related Occupation  (specify) |
|---|---|---|---|---|---|
| | Number | | | | |
| | Yrs. | Mos. | Yrs. | Mos. | |
| | 0 | 0 | 0 | 0 | n/a |

16. Occupational Title of Person Who Will Be Alien's Immediate Supervisor

Supervisor

17. Number of Employees Alien Will Supervise

0

ENDORSEMENTS  (Make no entry in section - for government use only)

| | Date Forms Received |
|---|---|
| L.O. | NOV 1 5 2005 |
| R.O. | N.O. |
| Ind. Code  7999 | Occ. Code  969. 687010 |
| Occ. Title  Carnival | Laborer |

1. Qualified workers cannot be found in the United States
2. Division of Foreign Labor Certification Policies have been observed.
3. This certification is valid from 1/5/06 through 11/1/06.

1/20/06          Marie C. Gonzalez
  (Date)              (Certifying Officer)

Replaces MA 7-50A, B and C (Apr. 1970 edition) which is obsolete.

C-06020-07301

ETA 750 (Oct. 1979)

| 18. COMPLETE ITEMS ONLY IF JOB IS TEMPORARY | | 19. IF JOB IS UNIONIZED (Complete) | |
|---|---|---|---|
| a. No. of Openings To Be Filled By Aliens Under Job Offer | b. Exact Dates You Expect To Employ Alien | a. Number | b. Name of Local |
| 40 | From 01/05/2006 | To 10/11/2006 | |

CORRECTION APPROVED BY REGIONAL OFFICE

11-01-2006 1-20-01

| 20. STATEMENT FOR LIVE-AT-WORK JOB OFFERS | | (Complete for Private Household Job ONLY) | | |
|---|---|---|---|---|
| a. Description of Residence ("X" one) ☐ House ☐ Apartment | Number of Rooms | b. No. Persons Residing at Place of Employment Adults — Children BOYS: GIRLS: | Ages | c. Will free board and private room not shared with anyone be provided? ("X" one) ☐ YES ☐ NO |

**21. DESCRIBE EFFORTS TO RECRUIT U.S. WORKERS AND THE RESULTS.** (Specify Sources of Recruitment by Name)

Will advertise per instructions from Dept. of Labor office.

**22.** Applications require various types of documentation. Please read PART II of the instructions to assure that appropriate supporting documentation is included with your application.

### 23. EMPLOYER CERTIFICATIONS

*By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.*

a. I have enough funds available to pay the wage or salary offered the alien.

b. The wage offered equals or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.

c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly or monthly basis.

d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.

e. The job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.

f. The job opportunity is not:

   (1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.

   (2) At issue in a labor dispute involving a work stoppage.

g. The job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law.

h. The job opportunity has been and is clearly open to any qualified U.S. worker.

### 24. DECLARATIONS

| DECLARATION OF EMPLOYER ➤ | Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury the foregoing is true and correct. | |
|---|---|---|
| SIGNATURE | | DATE 07/13/2005 |
| NAME (Type or Print) Bob DeStefano | TITLE Owner | |

| AUTHORIZATION OF AGENT OF EMPLOYER ➤ | I HEREBY DESIGNATE the agent below to represent me for the purposes of labor certification and I TAKE FULL RESPONSIBILITY for accuracy of any representations made by my agent. | |
|---|---|---|
| SIGNATURE OF EMPLOYER | | DATE 07/13/2005 |
| NAME OF AGENT (Type or Print) Joe A. Nichols | ADDRESS OF AGENT (Number, Street, City, State, ZIP Code) Law Office of Joe A. Nichols, P.A. 1033 W. First Street, Ste. E, Sanford, FL 32771 | |

**U.S. Department of Labor**    **Employment and Training Administration**
Chicago National Processing Center
844 N. Rush Street
12th Floor
Chicago, IL 60611



## FINAL DETERMINATION

November 07, 2006

DREAMLAND AMUSEMENTS INC              ETA Case Number:    C-06311-14820
c/o MALCOLM SEHEULT                        State Case #:    20060002710
15210 WATERLINE ROAD              Number of Openings:    45
BRADENTON, FL 34212                       Occupation:    Ride Operator
                                Period of Certification:    January 17, 2007 - November 06,
                                                          2007

In reply refer to:    Mary Glusak

The Department of Labor has made a final determination on your application for certification of
temporary alien employment pursuant to Title 20, Code of Federal Regulations, Part 655.

The Application for Alien Employment Certification, Form ETA 750A, has been certified and is
enclosed. All enclosures are required to be submitted to the U.S. Citizenship and Immigration Services,
U.S. Department of Homeland Security, at:

                    U.S. Department of Homeland Security
                    U.S. Citizenship and Immigration Services
                    Vermont Service Center
                    75 Lower Welden St.
                    Saint Albans, VT 05479

for consideration with your petition (Form I-129).

Sincerely,

Marie Gonzalez
Certifying Officer

CC: DREAMLAND AMUSEMENTS INC

Attachments: Form ETA 750A

OMB Approval No. 44-R1301

U.S. DEPARTMENT OF LABOR
Employment and Training Administration

**APPLICATION
FOR
ALIEN EMPLOYMENT CERTIFICATION**

IMPORTANT: READ CAREFULLY BEFORE COMPLETING THIS FORM
PRINT legibly in ink or use a typewriter. If you need more space to answer questions in this form, use a separate sheet. Identify each answer with the number of the corresponding question. SIGN AND DATE each sheet in original signature.

To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by $10,000 fine or 5 years in the penitentiary, or both (18 U.S.C. 1001)

PART A. OFFER OF EMPLOYMENT

| 1. Name of Alien (Family name in capital letter, First, Middle, Maiden) | | 3. Type of Visa (if in U.S.) |
|---|---|---|
| 45 unknown temporary workers | | |
| 2. Present Address of Alien (Number, Street, City and Town, State ZIP code or Province, Country) | | n/a |
| not in the U.S.A. | | |

CERTIFICATION
REGIONAL PROG. CTR. — Official

NOV 0 7 2006

RECEIVED

The following information is submitted as an offer of employment.

| 4. Name of Employer (Full name of Organization) | 5. Telephone |
|---|---|
| Dreamland Amusements Inc. | (866) 666-3247 |

| 6. Address (Number, Street, City and Town, State ZIP code) |
|---|
| 2 Olympia Lane, Stoney Brook, New York 11790 |

| 7. Address Where Alien Will Work (if different from item 6) |
|---|
| see attached Route Schedule |

| 8. Nature of Employer's Business Activity | 9. Name of Job Title | 10. Total Hours Per Week | | 11. Work Schedule | 12. Rate of Pay |
|---|---|---|---|---|---|
| carnival/amusement business | ride operator | a. Basic **40.** | b. Overtime **0** | (Hourly) 11:00 a.m. 07:00 p.m. | a. Basic $ Prevailing Wage ATTACHED b. Overtime $ 0.00 per hour |

| 13. Describe Fully the Job to be Performed (Duties) |
|---|
| Ride Operator- workers will operate various carnival rides and will assemble and disassemble the rides at each location. Worker shall collect tickets for the rides. Ability to lift in excess of 50 lbs. |

CORRECTION APPROVED BY
NATIONAL PROCESSING CENTER
_____ ON 11-7-06
DATE

| 14. State in detail the MINIMUM education, training, and experience for a worker to perform satisfactorily the job duties described in item 13 above. | | | 15. Other Special Requirements |
|---|---|---|---|
| EDUCATION (Enter number of years) | Grade **0** | High School **0** | College **0** | College Degree Required (specify) n/a Major Field of Study n/a | |
| TRAINING | No. Mos. **0** | No. Mos. **0** | Type of Training n/a | workers will be trained on location |
| EXPERIENCE | Job Offered **0** **0** | Related Occupation **0** **0** | Related Occupation (specify) none | |

| 16. Occupational Title of Person Who Will Be Alien's Immediate Supervisor | owner or ride supervisor | 17. Number of Employees Alien Will Supervise ▶ 0 |
|---|---|---|

ENDORSEMENTS (Make no entry in section - for Government use only)

Date Forms Received

| 1. Qualified workers cannot be found in the United States | L.O. | | R.O. SEP 2 7 2006 |
|---|---|---|---|
| 2. Division of Foreign Labor Certification Policies have been observed. | R.O. | | |
| 3. This certification is valid from 11/7/07 through 11/6/07 | Ind. Code 1899 | Occ. Code 5 4 2 6 9 3 0 10 |
| 1/9/06 (Date)  Emma C. Gonzalez (Certifying Officer) | | Occ. Title Ride Operator |

Replaces MA 7-50A, B and C (Apr. 1970 edition) which is obsolete.    ETA 750 (Oct. 1979)

0631·14820

| 18. COMPLETE ITEMS ONLY IF JOB IS TEMPORARY | | | | 19. IF JOB IS UNIONIZED (Complete) | | |
|---|---|---|---|---|---|---|
| a. No. of Openings To Be Filled By Aliens Under Job Offer | b. Exact Dates You Expect To Employ Alien | | | a. Number of Local | b. Name of Local | |
| | From | To | | | n/a | |
| 45 | 01/17/07 | 11/06/07 | | n/a | c. City and State  n/a | |

| 20. STATEMENT FOR LIVE-AT-WORK JOB OFFERS (Complete for Private Household ONLY) | | | | | | |
|---|---|---|---|---|---|---|
| a. Description of Residence | | b. No. Persons residing at Place of Employment | | | c. Will free board and private room not shared with anyone be provided? | ("X" one) |
| ("X" one)  ☐ House  ☐ Apartment | Number of Rooms | Adults | Children | Ages | | ☐ YES  ☐ NO |
| | | | BOYS | | | |
| | | | GIRLS | | | |

21. DESCRIBE EFFORTS TO RECRUIT U.S. WORKERS AND THE RESULTS. (Specify Sources of Recruitment by Name)

advertised for workers in local papers and magazines, but unable to find a high response to seasonal need. Our company must rely on contract or temporary workers to fill this position although this is difficult due to the transient nature of this occupation-i.e. constant travel from one location to another

22. Applications require various types of documentation. Please read Part II of the instructions to assure that appropriate supporting documentation is included with your application.

## 23. EMPLOYER CERTIFICATIONS

By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.

a. I have enough funds available to pay the wage or salary offered the alien.

b. The wage offered equals or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.

c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly, or monthly basis.

d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.

e. The job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.

f. The job opportunity is not:

(1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.

(2) At issue in a labor dispute involving a work stoppage.

g. The job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law.

h. The job opportunity has been and is clearly open to any qualified U.S. worker.

## 24. DECLARATIONS

| DECLARATION OF EMPLOYER | Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury the foregoing is true and correct. | |
|---|---|---|
| SIGNATURE | | DATE  September 12, 2006 |
| NAME (Type or Print)  Bob Destefano | | TITLE  Owner |

AUTHORIZATION OF AGENT OF EMPLOYER — I HEREBY DESIGNATE the agent below to represent me for the purposes of labor certification and I TAKE FULL RESPONSIBILITY for accuracy of any representations made by my agent.

| SIGNATURE OF EMPLOYER | | DATE  9/12/2006 |
|---|---|---|
| NAME OF AGENT (Type or Print)  Malcolm Scheult | | ADDRESS OF AGENT- (Number, Street, City, State, ZIP code)  15210 Waterline Road Bradenton, Florida, 34212 |

**U.S. Department of Labor**   **Employment and Training Administration**
Chicago National Processing Center
844 N. Rush Street
12th Floor
Chicago, IL 60611



## FINAL DETERMINATION

November 01, 2007

DREAMLAND AMUSEMENT, INC.
c/o JKJ WORKFORCE, TESS HARRISON
32755 FM 106
RIO HONDO, TX 78583

| | |
|---|---|
| ETA Case Number: | C-07303-28899 |
| State Case Number: | 20070004340 |
| Number of Openings: | 55 |
| Occupation: | Ride Operator |
| Period of Certification: | December 26, 2007 – November 09, 2008 |

The Department of Labor has made a final determination on your application for certification of temporary alien employment pursuant to Title 20, Code of Federal Regulations, Part 655.

The Application for Alien Employment Certification, Form ETA 750A, has been certified and is enclosed.

Upon receipt of this notification, you will need to submit the appropriate Form I-129 which is required in conjunction with an H-2B temporary labor certification application to the following address:

U.S. Department of Homeland Security
U.S. Citizenship and Immigration Services (USCIS)
California Service Center
Attn: I-129
P. O. Box 10129
Laguna Niguel, CA 92607-1012

The USCIS I-129 form can be obtained at http://www.immigration.gov.

Sincerely,

Marie Gonzalez
Certifying Officer

CC: DREAMLAND AMUSEMENT, INC.

Attachments: Form ETA 750A

OMB Approval No. 44-R1301

U.S. DEPARTMENT OF LABOR
Employment and Training Administration

**APPLICATION**
**FOR**
**ALIEN EMPLOYMENT CERTIFICATION**

IMPORTANT: READ CAREFULLY BEFORE COMPLETING THIS FORM
PRINT legibly in ink or use a typewriter. If you need more space to answer questions in this form, use a separate sheet. Identify each answer with the number of the corresponding question. SIGN AND DATE each sheet in original signature.
To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by $10,000 fine or 5 years in the penitentiary, or both (18 U.S.C. 1001).

**PART A. OFFER OF EMPLOYMENT**

1. Name of Alien    (Family name in capital letters, First, Middle, Maiden)
**55 Unnamed Aliens**

2. Present Address of Alien    (Number, Street, City and Town, State ZIP code or Province, Country)
**N/A**

3. Type of Visa    (If in U.S.)
**N/A**

The following information is submitted as an offer of employment.

4. Name of Employer    (Full name of Organization)
**Dreamland Amusements, Inc.**

OCT 3 0 2007

5. Telephone
**(516) 901-2988**

6. Address    (Number, Street, City and Town, State ZIP code)
**2 Olympia Lane, Stony Brook, NY 11790**

7. Address Where Alien Will Work    (If different from Item 6)
**As per the attached itinerary.**

8. Nature of Employer's Business Activity
**Traveling Carnival**

9. Name of Job Title
**Amusement Attendant**
Carnival [39-3091]

10. Total Hours Per Week
a. Basic **38**
b. Overtime **0**

11. Work Schedule (Hourly)
11:30 a.m.
08:30 p.m.

12. Rate of Pay
a. Basic **$8.13** per hour
b. Overtime **$12.20** per hour

13. Describe Fully the Job to be Performed    (Duties)
**Preforms variety of attending duties at amusement or recreation facility. May schedule use of recreation facilities, maintain and provide equipment to participants of sporting events or recreational pursuits, or operate amusement concessions and rides.**

14. State in detail the MINIMUM education, training, and experience for a worker to perform satisfactorily the job duties described in Item 13 above.

| EDU-CATION (Enter number of years) | Grade School **0** | High School **0** | College **0** | College Degree Required (specify) **N/A** Major Field of Study **N/A** |
|---|---|---|---|---|
| TRAIN-ING | No. Yrs. **0** | No. Mos. **0** | Type of Training **N/A** | |
| EXPER-IENCE | Job Offered Yrs. **0** Mos. **0** | Related Occupation Number Yrs. **0** Mos. **0** | Related Occupation (specify) **N/A** | |

15. Other Special Requirements

**Travel with Carnival.**

16. Occupational Title of Person Who Will Be Alien's Immediate Supervisor
**Supervisor**

17. Number of Employees Alien Will Supervise **0**

ENDORSEMENTS    (Make no entry in section - for Government use only)

| | Date Forms Received |
|---|---|
| L.O. | SEP 2 6 2007 |
| R.O. | N.O. |

qualified workers cannot be found in the United States
ivision of Foreign Labor Certification Policies
ave been observed.
his certification is valid from 4/24/07 through 4/9/08

Ind. Code **7999**
Occ. Code **34-2662010**

Occ. Title **Ride operator**

Replaces MA 7-50A, B and C (Apr. 1970 edition) which is obsolete.

ETA 750 (Oct. 1970)

**07303 - 28899**

| 18. COMPLETE ITEMS ONLY IF JOB IS TEMPORARY | | | | 19. IF JOB IS UNIONIZED (Complete) | | |
|---|---|---|---|---|---|---|
| a. No. of Open-ings To Be Filled By Aliens Under Job Offer | b. Exact Dates You Expect To Employ Alien | | | a. Number of Local | b. Name of Local | N/A |
| | From | To | | | | |
| 55 | 12/26/07 | 11/09/08 | N/A | | c. City and State | N/A |

20. STATEMENT FOR LIVE-AT-WORK JOB OFFERS (Complete for Private Household ONLY)

| a. Description of Residence | | b. No. Persons residing at Place of Employment | | | | | c. Will free board and private room not shared with any-one be provided? | (X one) |
|---|---|---|---|---|---|---|---|---|
| (X one) | Number of Rooms | Adults | | Children | | Ages | | ☐ YES ☐ NO |
| ☐ House | | | BOYS | | | | | |
| ☐ Apartment | | | GIRLS | | | | | |

21. DESCRIBE EFFORTS TO RECRUIT U.S. WORKERS AND THE RESULTS. (Specify Sources of Recruitment by Name)

We spread the word of employment by word of mouth. We are able to fill some temporary positions with local workers, but we have a chronic shortage of at least 40 to 50 positions that we are not able to fill.

22. Applications require various types of documentation. Please read Part II of the Instructions to assure that appropriate supporting documentation is included with your application.

### 23. EMPLOYER CERTIFICATIONS

By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.

a. I have enough funds available to pay the wage or salary offered the alien.

b. The wage offered equals or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.

c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly, or monthly basis.

d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.

e. The job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.

f. The job opportunity is not:

(1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.

(2) At issue in a labor dispute involving a work stoppage.

g. The job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law.

h. The job opportunity has been and is clearly open to any qualified U.S. worker.

### 24. DECLARATIONS

| DECLARATION OF EMPLOYER | Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury the foregoing is true and correct. | |
|---|---|---|
| SIGNATURE Kathryn L. Distefano | | DATE 08/08/07 |
| NAME (Type or Print) Kathryn L. Destefano | TITLE President | |
| AUTHORIZATION OF AGENT OF EMPLOYER | I HEREBY DESIGNATE the agent below to represent me for the purposes of labor certification and I TAKE FULL RESPONSIBILITY for accuracy of any representations made by my agent. | |
| SIGNATURE OF EMPLOYER Kathryn L. Distefano | | DATE 08/08/07 |
| NAME OF AGENT (Type or Print) | ADDRESS OF AGENT (Number, Street, City, State, ZIP code) | |

JKJ Workforce, Tess Harrison,  32775 FM 106, Rio Honda, TX 78583